IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DEMARCUS HARRIS,

     Plaintiff,

v.

SHERIFF THEODORE JACKSON, *in
his official and individual capacities*,
*et al.*,

     Defendants.

CIVIL ACTION FILE NO.

1:19-cv-5849-MLB-JKL

## **FINAL REPORT AND RECOMMENDATION**

This is an employment action in which Plaintiff DeMarcus Harris, a former detention officer in the Fulton County Sheriff's Office (the "Sheriff's Office"), alleges that Defendant Sheriff Theodore Jackson, acting in his official capacity, violated Title VII of the Civil Rights Act of 1964 ("Title VII"), and Defendants Jackson, Anthony Richardson, Temeka Cherry, and Tyna Taylor, violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (the "EPC"), by discriminating against him on the basis of his sexual orientation and by retaliating against him for engaging in activity protected by Title

VII.[1]  [*See* Doc. 14 (Am. Compl.).]  This matter is presently before the Court on

Defendants' motion for summary judgment.  [Doc. 56.]  For the following reasons,

the undersigned **RECOMMENDS** that the motion for summary judgment be

**GRANTED IN PART AND DENIED IN PART**.

I.      **BACKGROUND**

        A.      **Consideration of Facts**

        The Court draws many of the facts in the following summary from the

uncontested portions of Defendants' Statement of Undisputed Material Facts

("DSMF") [Doc. 56-2] and Plaintiff's Statement of Additional Material Facts

Presenting Genuine Issues for Trial ("PSAMF") [Doc 65-2].  The undersigned has

also considered Plaintiff's responses to Defendants' Statement of Undisputed

Material Facts ("R-DSMF") [Doc. 65-1] and Defendants' responses to Plaintiff's

Statement of Additional Material Facts ("R-PSAMF") [Doc. 66-1].   Where

possible, the Court has relied on those statements of facts and responses.  The Court

does not rule on each and every objection or dispute presented by the parties in this

---

[1] While Plaintiff named the Fulton County Sheriff's Office as a defendant originally [*see* Docs. 1, 14], the parties stipulated to its dismissal soon after Defendants answered Plaintiff's amended complaint because Sheriff Jackson, in his official capacity as the constitutionally elected officer of the Sheriff's Office, was the appropriate defendant to be named as Plaintiff's employer [*see* Doc. 17].

report and recommendation, and discusses objections and disputes only when necessary to do so regarding a genuine dispute of a material issue of fact. The Court has also conducted its own review of the materials submitted in support, including the depositions and declarations filed in this case, and includes facts drawn from its independent review of the record. *See* Fed. R. Civ. P. 56(c)(3).

The facts are presented in the light most favorable to Plaintiff. *See Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004). Where there is a conflict in the evidence, the Court accepts Plaintiff's evidence as true because he is the non-moving party. *See Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.*, 207 F.3d 1351, 1356 (11th Cir. 2000) ("If there is a conflict between the plaintiff's and the defendant's allegations or in the evidence, the plaintiff's evidence is to be believed and all reasonable inferences must be drawn in his favor."). Where the party responding to a statement has neither refuted nor stated valid objections to the material facts as set forth in the statement, those facts are deemed admitted by operation of law. LR 56.1B(2), NDGa.; *Reese v. Herbert*, 527 F.3d 1253, 1267-69 (11th Cir. 2008). In those instances where a party denies a statement of fact (in whole or in part), the Court has reviewed the record to determine whether it is disputed and, if so, whether any dispute is material.

Additionally, the Court includes some facts drawn from its independent review of the record.  *See* Fed. R. Civ. P. 56(c)(3).  The Court has also excluded assertions of fact by either party that are immaterial or presented as arguments or legal conclusions, as well as assertions of fact unsupported by a citation to evidence in the record, stated as a legal conclusion, or asserted only in the party's brief and not the statement of facts.  *See* LR 56.1B(1), NDGa.; *see also Chapman v. AI Transp.*, 229 F.3d 1012, 1051 n.34 (11th Cir. 2000) (en banc) (subjective perceptions, conclusory allegations, or allegations that are otherwise unsupported by record evidence do not create genuine issues of material fact to withstand summary judgment); *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (same).

### B.    Factual Summary

#### 1.    Plaintiff and Defendants

Plaintiff is a gay man.  (DSMF ¶ 5; PSAF ¶ 1.)  He worked as a detention officer for the Sheriff's Office between March 2018 and April 2019—a little over a year.  (DSMF ¶ 5; PSAMF ¶ 2.)

Between 2008 and January 2021, and thus, at all times relevant to this action, Defendant Jackson was the Fulton County Sheriff.  (DSMF ¶ 3.)[2]  The current

---

[2] The Sheriff is a constitutionally elected officer.  (DSMF ¶ 1.)

4

Sheriff is Patrick Labat.  (DSMF ¶ 4.)  The remaining Defendants, meanwhile, held the following positions:

- Defendant Cherry was a lieutenant with the Sheriff's Office, who indirectly supervised Plaintiff when he began his employment at the Fulton County Jail (the "Jail"), and indirectly supervised him again when Plaintiff and Cherry both were assigned to Grady Hospital. (DSMF ¶ 8; PSAMF ¶ 5.)

- Defendant Richardson was a lieutenant with the Sheriff's Office, and served as Plaintiff's second level supervisor for a period in 2018 as well.  (*See* DSMF ¶ 7; R-DSMF ¶ 7; *see also* Dep. of Antonio Richardson [Doc. 57 ("Richardson Dep.")] 19-20.)

- Defendant Taylor was a Captain with the Sheriff's Office, and began indirectly supervising Plaintiff in February or March 2019, after she too was moved to Grady Hospital.  (DSMF ¶ 9.)

In addition to the parties, Angela Sanders was a sergeant with the Sheriff's Office, who served as Plaintiff's direct supervisor during 2018.  (*See* DSMF ¶ 6; R-DSMF ¶ 6; *see also* Dep. of DeMarcus Harris [Doc. 59 ("Pl.'s Dep.")] 19-20; Dep. of Angela Sanders [Doc. 59 ("Sanders Dep.")] 19-20.)   Yolanda Lee was also a

sergeant with the Sheriff's Office, and she directly supervised Plaintiff while they both worked at Grady Hospital. (DSMF ¶ 10.) Finally, Plaintiff's husband, who was recently promoted to sergeant, is also employed by the Sheriff's Office. (DSMF ¶ 22; *see also* R-DSMF ¶ 22.)

### 2. The Fulton County Sheriff's Office

The Sheriff's Office is divided into four divisions: the jail division, the law enforcement division, the courts division, and the administrative division. (DSMF ¶ 2.) The Jail operates constantly—24 hours a day, 7 days a week, and 365 days a year. (DSMF ¶ 11.) Generally speaking, it has three shifts: (1) 7:00 a.m. to 3:00 p.m.; (2) 3:00 p.m. to 11:00 p.m.; and (3) 11:00 p.m. to 7:00 a.m. (*Id.*) The Jail also has multiple floors. Each floor of the jail has two sides, which are typically referred to as south and north. (DSMF ¶ 16.) Each side typically has a sergeant and two to three detention officers. (DSMF ¶ 17.) Lieutenants typically supervise two floors. (DSMF ¶ 18.) Lieutenants in turn report to Captains, and Captains report to Majors. (DSMF ¶ 19.)

### 3. Plaintiff's Employment

As discussed, Plaintiff began his employment with the Sheriff's Office in March 2018, starting as a detention officer. (DSMF ¶ 20.) His first assignment was at the Fulton County Jail, where he was responsible for securing the jail for

6

safety and overseeing the inmates. (DSMF ¶ 21; PSAMF ¶ 3.) After completing his training, Plaintiff was assigned to the fourth floor, north side of the jail. (PSAMF ¶ 4.) At that time, Harris reported to Defendant Cherry. (PSAMF ¶ 5.)

### 4.  Alleged Homophobic Comment

Around June 18, 2018, Nurse Iesha Johnson told Plaintiff's husband that a coworker, fellow detention officer Levan Wilson, supposedly said that he did not like working with Plaintiff's "gay ass"; Plaintiff's husband then informed Plaintiff of the purported comment the following day. (DSMF ¶¶ 23-24; PSAMF ¶¶ 6-7; *see also* Pl. Dep. 12-15.) Plaintiff reported Wilson's comment to Lt. Cherry the day after that. (PSAMF ¶ 7.) According to Plaintiff, Lt. Cherry suggested Plaintiff speak with Wilson one-on-one. (Pl. Dep. 16.) Plaintiff admits that Wilson never made any inappropriate comments directly to Plaintiff (*see* Pl. Dep. 15-16), and that when Plaintiff confronted Wilson, Wilson denied making the comment to Nurse Johnson (DSMF ¶ 26). Even so, Plaintiff testified that around that time, he sensed some "tension" with Wilson. (Pl. Dep. 16-18.) Following their conversation, Plaintiff was still required to work on the same floor as Wilson. (PSAMF ¶ 10.)

Lt. Cherry apparently then had a conversation with Plaintiff's husband, who separately told her that Wilson made the homophobic comment to Nurse Johnson.

7

(DSMF ¶ 27.) Lt. Cherry testified, however, that because Nurse Johnson did not bring this issue directly to her, Lt. Cherry viewed it as hearsay or gossip without any concrete evidence. (Cherry Dep. 68, 86-79.) Still, Lt. Cherry spoke to Wilson, asking if he had said anything negative about his coworkers with a civilian employee,[3] but he told her he did not know what she was talking about. (*Id.* at 65, 67-68.) Lt. Cherry warned Wilson that, regardless, comments of that nature were "not going to be tolerated." (*Id.* at 66.) Afterward, she emailed the staff on the floor, noting that they were "not getting along," and instructing that the "gossip and rumors" would not be permitted. (*Id.*)

Around June 25, 2018, Sgt. Sanders became the assigned sergeant on the north side of the fourth floor. (PSAMF ¶ 15.) Plaintiff spoke with Sgt. Sanders on the same day or soon after she arrived on the floor to let her know that he felt discriminated against as a result of Wilson's comment. (PSAMF ¶ 16.) Sgt. Sanders did not attempt to speak to Wilson at that time (Sanders Dep. 25), but did indicate she would speak with Lt. Richardson, who supervised the entire fourth

---

[3] Lt. Cherry did not want to telegraph the alleged statement with a leading question, in order to protect Plaintiff's identity and to help prevent the situation from exploding. (Cherry Dep. 77-79.)

floor (PSAMF ¶ 18).  Sgt. Sanders thereafter informed Plaintiff that a meeting

would be held.  (PSAMF ¶ 20.)

### 5.    Ricardson's Investigation

Roughly a week later, on August 2, 2018, Plaintiff met with Lt. Richardson,

Sgt. Sanders, and Wilson.  (DSMF ¶ 32.)  At the meeting, Plaintiff asserted that

Wilson did not like working with him because he was gay, which was when Lt.

Richardson first learned[4] that Wilson had made the homophobic comment.  (DSMF

¶¶ 31, 33.)  Lt. Richardson asked Wilson if he had made the comment regarding

Plaintiff, but Wilson did not immediately respond.  (PSAMF ¶ 22.)  Lt. Richardson

then indicated he wanted to talk to Wilson one-on-one, and the two spoke privately

for about five minutes.  (PSAMF ¶ 23; Pl. Dep. 23.)  Wilson denied making the

statement, and explained to Lt. Richardson that he did not like working with

Plaintiff because Plaintiff had accused him of making a homophobic comment.[5]

(Richardson Dep. 37-38, Ex. 9.)  Five minutes later, Lt. Richardson returned and

---

[4] It appears that Sgt. Sanders did not speak with Lt. Richardson about the complaint prior to the meeting.  (Richardson Dep. 48.)

[5] During a later investigation into the incident, Wilson described his encounter with Nurse Johnson and explained that he told her that he did not like working with Plaintiff because of the way he ran the prison floor.  (Cherry Dep. Ex. 8)

told Sgt. Sanders, "I'll get back with you." (PSAMF ¶ 24.) Lt. Richardson testified that, at the time, he trusted both officers, but planned to approach the issue with a "trust but verify" mentality. (Richardson Dep. 39-42.)

Lt. Richardson first shared Plaintiff's complaint with three other lieutenants, including Lt. Cherry, who shared disbelief that the situation was still ongoing. (PSAMF ¶¶ 28-29); and then brought the issue to his Captain's attention, who ordered him to conduct an investigation (DSMF ¶ 35; PSAMF ¶¶ 30-31). During the course of that investigation, Lt. Richardson made a number of findings. Among other things, he learned that Plaintiff did not hear the comment directly from Wilson, and instead learned about it secondhand from his husband, who in turn heard it thirdhand from Nurse Johnson. (DSMF ¶ 36; PSAMF ¶ 33.) When Lt. Richardson spoke with Nurse Johnson, she affirmed that Wilson made the "gay ass" comment, but also refused to provide a written statement confirming it, saying she did not want to be "put in the middle of this." (DSMF ¶ 37; PSAMF ¶ 34; *see also* Richardson Dep. 57-58, Ex. 9.)

Ultimately, Lt. Richardson provided a written report outlining his conclusions and making several recommendations. (DSMF ¶ 38; PSAMF ¶ 32; *see also* Richardson Dep. Ex. 9 (Richardson investigative report).) Although the report

did not definitively support Plaintiff's allegations against Wilson, Lt. Richardson nevertheless recommended that Wilson "receive a counseling session for gossiping," to ensure any such comments were not made in the future and to make clear that Wilson would be disciplined should he ever make them.  (Richardson Dep. 63-64, Ex. 9.)  He also issued a warning to Sgt. Sanders because he believed she should have brought the issue to his attention sooner.  (DSMF ¶ 39; PSAMF ¶ 36; *see also* Richardson Dep. Ex. 2 (warning).) [6]   Finally, Lt. Richardson recommended that Plaintiff be transferred to another floor because he was not getting along with his coworkers and because he (Plaintiff) had expressed concerns that led Lt. Richardson to believe Plaintiff did not feel safe working on the shift.[7] (DSMF ¶ 41; R-DSMF ¶ 41; PSAMF ¶ 35; *see also* Richardson Dep. 63-67, Ex. 9 (describing the reason for the relocation as "dysfunctionality of the floor resulting in an unsafe work environment for him").

---

[6] In the warning, Lt. Richardson noted that Plaintiff "has threatened to file an EEOC complaint," and that "[g]iven the serious nature of his complaint, I want to put particular emphasis on the importance of relaying pertinent information such as this incident."  (PSAMF ¶ 37.)

[7] Indeed, Plaintiff testified that he felt there was tension with Wilson, as Plaintiff thought Wilson was not opening doors for him (Plaintiff) as quickly as other officers.  (Pl. Dep. 16-18.)

### 6.    Plaintiff's Initial Floor Transfer and Return

In early August 2018, Capt. Maurice Arnold met with some of his lieutenants, including Lt. Richardson, Lt. Cherry, and Kristi Mayo.  (Richardson Dep. 88.)  Among other things, they discussed potential moves for detention officers, including Plaintiff.  (Richardson Dep. 88-89; Cherry Dep. 71, 101; PSAMF ¶ 39.)  Capt. Arnold ultimately moved about thirteen employees, including Plaintiff, who was reassigned to the third floor with new days off (Wednesdays and Thursdays) but the same working hours.  (DSMF ¶¶ 45, 48; PSAMF ¶¶ 43, 47.)  Plaintiff testified that Lt. Cherry told him that Lt. Richardson made the recommendation (PSAMF ¶ 48).

Plaintiff was notified of the move by email on August 3, 2018, and the transfer became effective August 8.[8]  (DSMF ¶ 47; PSAMF ¶ 42; *see also* Pl. Dep. Ex. 1 (memo from Lt. Cherry regarding the transfer).)  Sgt. Karla Ball (who is an openly lesbian woman), Appreonna Sullivan, and Wilson remained on the fourth floor after Plaintiff was reassigned.  (DSMF ¶ 46; R-DSMF ¶ 46.)  When Plaintiff was transferred, he did not suffer any loss in pay or title, and in fact, earned more

---

[8] Plaintiff was on vacation from August 9, 2021, until he returned to work on August 13, 2021.  (DSMF ¶ 49; R-DSMF ¶ 49.)

money after the transfer as a result of extra overtime.  (DSMF ¶¶ 50, 51.)  At the same time, because he was working longer hours, the transfer impacted his ability to transport his daughter to and from school, as he had trouble waking up to bring her to school and/or to pick her up, but the Court has not been presented with evidence that the decisionmakers were aware of Plaintiff's childcare issues when they made the decision to transfer him.  (DSMF ¶ 52; PSAMF ¶ 49; R-PSAMF ¶ 49.)

On August 4, 2018, Plaintiff spoke briefly with Lt. Richardson about the move.  (Pl. Dep. 28.)  Lt. Richardson told Plaintiff that the move was for Plaintiff's "safety" but did not explain what he meant by that.[9]  (PSAMF ¶¶ 44, 49.)  Lt. Richardson also told Plaintiff that he did not think that Wilson made the comments about which Plaintiff had complained.  (PSAMF ¶ 49.)  Plaintiff then explained "how this is going to impact [his] life" and expressed that it was unfair to move him when he had done nothing wrong.  (Pl. Dep. 33-34.)

---

[9] Lt. Richardson separately testified that there was some concern about inmates knowing about Plaintiff's sexuality (Richardson Dep. 44), but Sgt. Sanders denied that there were any known safety issues or threats to Plaintiff (Sanders Dep. 66).

13

On August 7, 2018, Plaintiff filed an internal complaint of discrimination. (DSMF ¶ 54.)  Fulton County's Office of Diversity and Civil Rights (the "ODC") conducted an investigation and concluded that Plaintiff's complaint—that Wilson made the homophobic comment in question—could not be "substantiated."  (Pl. Dep. Ex. 8 at 10.)

Plaintiff requested another meeting, and on August 24, 2018, Plaintiff spoke to Capt. Arnold about the floor change and his new days off.  (DSMF ¶ 56; PSAMF ¶ 52.)  According to Plaintiff, Capt. Arnold apologized for the situation (Pl. Dep. 36), and, the next day, the Sheriff's Office returned him to the fourth floor north with Tuesdays and Wednesdays off (DSMF ¶ 56).  When Plaintiff moved back to the fourth floor, Capt. Arnold also changed the reporting structure so that Plaintiff no longer reported to Lt. Richardson.  (DSMF ¶ 57.)  Additionally, about a week after Plaintiff returned to the fourth floor, Wilson was moved to a different area of the jail so that Plaintiff no longer worked directly with him.  (Pl. Dep. 37; Richardson Dep. 96; Sanders Dep. 63-64; Cherry Dep. 141, 146-47, Ex. A.)

Plaintiff testified that, around this time, he started going to counseling to help cope with his workplace problems, and that Human Resources approved a request to take time off in August 2018 at his counselor's recommendation.  (Pl. Dep. 37-

40.)  Despite HR approving the time off, Plaintiff testified that Sgt. Sanders wrote him up for the time he was away.  (Pl. Dep. 37.)  It is unclear whether Sgt. Sanders knew about HR's approval, and neither party has cited evidence on that point.

Around the same time or soon after, Lt. Mayo became the supervisor of Plaintiff's area of fourth floor, and she started monitoring Plaintiff, speaking to him regularly, and questioning him about things.  (Pl. Dep. 62-63, 66, 68; Cherry Dep. 146-48.)  Soon after, Plaintiff was called into a meeting with Lt. Mayo, Sgt. Sanders, and Capt. Arnold on August 30, 2018, and told he was being written up for fraternizing with inmates.  (DSMF ¶ 92; PSAMF ¶ 68.)  When Plaintiff asked why, Sgt. Sanders told him that he was giving inmates deputy trays (containing the meals the deputies also ate).  (PSAMF ¶ 69.)  The Sheriff's Office had a policy that only allowed trustees to receive deputy trays, and Plaintiff was indeed giving them to inmate orderlies. (Cherry Dep. 156-57, 163; Pl. Dep. 64.)   Plaintiff was also informed that he was on the verge of being discharged.  (Pl. Dep. 65-66.)  However, Plaintiff contends that it was common practice for certain inmates—namely, the inmate orderlies who helped the detention officers serve other inmates—to receive deputy trays.  (DSMF ¶ 95.)  When Plaintiff complained at the meeting that it was not fraternization to give orderlies the deputy trays, indicated that it was unfair, and

15

expressed his belief that he was being targeted for submitting his most recent complaint to the ODC, Capt. Arnold told him to return to his floor while he (Capt. Arnold) spoke with Sgt. Sanders. (Pl. Dep. 64.) When Sgt. Sanders returned to the fourth floor, she told Plaintiff that the write-up for fraternization was being thrown out. (*Id.*) The following day, Lt. Mayo apologized to Plaintiff for their interaction at the meeting, saying she had been a "little rude"; Plaintiff responded that "[t]he damage has already been done." (Pl. Dep. 67.)

Plaintiff apparently filed his charge of discrimination with the Equal Employment Opportunity Commission the same day as the meeting, August 30, 2018. (Decl. of DeMarcus Harris ("Pl. Decl." [Doc. 65-3] ¶ 3, Ex. A.)

Even after Plaintiff had been reassigned back to the fourth floor, on September 2, 3, and 9, 2018, he was moved to other floors to help. (Pl. Dep. 44-45; PSAMF ¶ 65; DSMF ¶ 97.) Lt. Cherry explained that the changes were made because of staffing needs, including that detention officers were out for vacation, sick leave, or mandatory training.[10] (Decl. of Temeka Cherry [Doc. 56-3] ¶¶ 24-29.) Even so, Plaintiff asserts that on unspecified occasions, he believed the

---

[10] The deployment records for these days show that multiple detention officers were impacted by these staffing needs—not just Plaintiff. (Cherry Decl. ¶¶ 27-29.)

Sheriff's Office was simply swapping one officer on another floor with Plaintiff. (PSAMF ¶ 66.)

In early September 2018, Plaintiff put in a request for leave September 28 and 29, 2018, which was initially approved; however Lt. Cherry[11] later denied the request because Plaintiff had insufficient vacation days remaining.[12]  (PSAMF ¶¶ 59-62; *see also* Cherry Dep. 176-80; Pl. Dep. 43 (admitting that he only had a single day of vacation, but not two).)  Although his vacation request was denied on this basis, Plaintiff still took those two days off as sick days (as well as Saturday, September 22, Thursday, September 27, and Sunday, September 30).  (Pl. Dep. 43, 55-56, Ex 4; DSMF ¶ 107; R-DSMF ¶ 107.)

### 7.    Plaintiff's Injury and Transfer to Grady

In October 2018, Plaintiff injured himself moving furniture outside of work. (DSMF ¶ 59; PSAMF ¶ 77.)  As a result of his injury, Plaintiff was out of work between October 22 and December 20, 2018.  (DSMF ¶ 60; PSAMF ¶ 77; PSAMF

---

[11] As Assistant Watch Commander, Lt. Cherry was responsible for approving/denying vacation requests.  (DSMF ¶ 101.)

[12] Plaintiff indicated in his request that he wished to use "comp" time rather than vacation time.  (Pl. Dep. Ex. 3.)  According to Lt. Cherry, this just referred to how Plaintiff would be paid for any time off, and that regardless of whether Plaintiff used "comp" time or vacation time, employees were still required to have accrued vacation leave in order to cover absences.  (Cherry Dep. 176-80.)

¶ 78.)  During this period, there was a staffing need for more detention officers at Grady Hospital.[13]  (Decl. of Yolanda Lee [Doc. 56-4] ¶ 5.)  Lt. Richardson testified that prior to Plaintiff's transfer to Grady, Capt. Arnold told the lieutenants that they needed a few names of individuals to send to Grady, and that the lieutenants "threw some names at him."  (PSAMF ¶ 80.)  No one appears to recall who offered up Plaintiff's name for the transfer.  (*See* Richardson Dep. 129-32; Cherry Dep. 194-96; Lee Decl. ¶¶ 4-6; Cherry Decl. ¶¶ 12, 31; Sanders Dep. 91-93.)[14]

When he returned to work, Plaintiff went to work as a detention officer at Grady, where he guarded inmates who either had been injured during their arrest or were otherwise receiving treatment at Grady.  (DSMF ¶ 61; PSAMF ¶¶ 79, 83.)  Two other detention officers were also sent to Grady.  (Lee Decl. ¶¶ 4-5.)  Lt. Cherry was likewise moved, without explanation, from the Jail to the Grady Detention Center/South Annex around the same time as Plaintiff, and assigned to the morning shift.  (Cherry Dep. 23; PSAMF ¶ 91.)  At Grady, Plaintiff reported

---

[13] According to Lt. Cherry, "when I came to Grady, I was begging for people to come and help us because we were so short . . . .  I had people that was volunteering stay over . . . doing double shifts, doing their overtime."  (Cherry Dep. 210-11.)

[14] It appears that Lt. Mayo and Capt. Arnold were not deposed, and neither party has offered evidence from them that would shed further light on the situation.

directly to Sgt. Yolanda Lee and indirectly to Lt. Hambrick.[15]  (DSMF ¶¶ 64, 84.)
Plaintiff had a discussion with Sgt. Lee about his complaint of discrimination and
told her that he had been harassed at the jail.  (PSAMF ¶ 85.)  Plaintiff had a good
working relationship with Sgt. Lee, and Sgt. Lee never made any comments to
Plaintiff that he felt were inappropriate.  (DSMF ¶ 68.)

Plaintiff testified that when he worked at Grady, the Sheriff's Office had a
mandatory overtime requirement in place, and "usually they would send you to the
jail to work overtime."  (Pl. Dep. 50-51.)  Plaintiff alleges that while he was never
disciplined for missing overtime work, he was still overlooked for overtime hours
at the jail, despite requesting approval for overtime work at the Jail from Lt. Cherry,
and that he lost income as a result.  (*Id.* at 51; Lee Decl. ¶ 23; DSMF ¶ 69.)  Even
so, Plaintiff still worked some overtime, including during several "double shifts."
(Lee Decl. Ex. A.)  Plaintiff reached out to Sgt. Lee by email in January 2019 to
ask if she had heard from Lt. Cherry about his overtime requests; Sgt. Lee
responded that Lt. Cherry still had Plaintiff on "stand by."  (PSAMF ¶¶ 88-89.)
Regardless, Plaintiff was never approved to perform overtime at the Jail in the

---

[15] The undersigned could not locate Lt. Hambrick's name in any of the
materials presented to the Court.

months before his separation.  (PSAMF ¶ 89.)  Plaintiff testified that multiple detention officers at Grady were sent to the Jail for overtime, but he has not identified anyone in particular.  (Pl. Dep. 53-54.)

### 8.   Plaintiff's Absenteeism and Discharge

Detention officers are expected to clock in 15 minutes before their shift to attend roll call; thus, if a shift is scheduled to start at 3:00 p.m., the detention officer must clock in by 2:45 p.m.  (Cherry Decl. ¶ 7.)[16]  While Plaintiff testified that he was told during his training that there was a 10-minute grace period for clocking in (Pl. Dep. 78), Lts. Richardson and Cherry testified that there has never been any sort of grace period (Richardson Dep. 26; Cherry Decl. ¶ 8), and Plaintiff admitted that Sgt. Lee informed him in January 2019 that the grace period did not apply to sheriff's deputies or officers (*id.* at 78-79).[17]  Under the Sheriff's Office's

---

[16] Plaintiff disputes a number of Defendants' statements of fact based not on the facts asserted or the evidence cited, but entirely based upon legal implications of those facts. (*See*, *e.g.*, R-DSMF ¶¶ 12, 28, 41, 48, 55, 62, 63, 77, 90, 98, 99.)  In such instances, because Plaintiff's objections are argumentative and lack citation to record evidence, they are overruled and the Defendants' factual statements are deemed admitted.  *See* LR 56.1B(2), NDGa.; *see also Reese*, 527 F.3d at 1267-69; *Chapman*, 229 F.3d at 1051 n.34.

[17] Plaintiff states that he has never seen a written policy confirming that the 10-minute grace period did not apply to Sheriff's Office detention officers.  (Pl. Dep. 26.)

attendance policy, employees are in violation of the policy if they are late three or more times in a 90-day period.  (DSMF ¶ 14; R-DSMF ¶ 14.)

In December 2018, Plaintiff was late five times—on December 20, 27, 28, 29, and 30.  (Pl. Dep. 72-73, Ex. 8; Lee Decl. ¶ 13.)  On January 3, 2019, Sgt. Lee issued a verbal warning to Plaintiff related to his December 2018 attendance. (DSMF ¶ 17; R-DSMF ¶ 17; PSAMF ¶ 93; Pl. Dep. Ex. 8.)  Although Sgt. Lee states that she was unaware of Plaintiff's complaints about Wilson at the time she prepared the first warning (Lee Decl. ¶ 10), Plaintiff testified that Sgt. Lee discussed the complaint "when they moved me over [to Grady]" (Pl. Dep. 49-50). Plaintiff had not been written up for tardiness before.  (PSAMF ¶ 94.)

On January 4, 2019, Plaintiff provided a written explanation for his tardiness. (Pl. Dep. 75-76, Ex. 9.)  According to Plaintiff, he was late because he could not find parking three times (despite knowing there were parking issues), because of traffic once, and because of weather once; he also claimed that Fulton County Personnel Policy 301-16 applied to him and provided him with a 10-minute grace period before an unscheduled tardiness would count against him, as well as an excuse for any tardiness "beyond the employee's control," such as weather or other "unexpected" delays.  (Pl. Dep. Ex. 9.)  Apparently, Plaintiff blamed the Sheriff's

Office's lack of parking at Grady for his repeated tardiness.  (Pl. Dep. 76-77 (noting that he either had to pay for parking or find a law enforcement spot that was usually taken by Atlanta police officers), 81-85 ("We just didn't have the parking spaces. And she knows that I didn't have the funds for a pass to park at the garage.").)  It was around this time that Sgt. Lee clarified with Plaintiff that any 10-minute grace period did not apply to the Sheriff's Office's detention officers, but only to court workers.  (Pl. Dep. 78-79.)

After Plaintiff was late four times in January 2019 and five times in February 2019, Sgt. Lee issued a written warning to Plaintiff for attendance issues on February 21, 2019.[18]  (PSAMF ¶ 101; Pl. Dep. 80-81; Def. Ex. 10.)  Plaintiff complained to Sgt. Lee that it was unfair, since the free law enforcement spots were usually full and he could not afford to pay for garage parking.  (Pl. Dep. 81.)  Plaintiff also received a Plan of Action with strategies to improve his attendance. (DSMF ¶ 77; R-DSMF ¶ 77; PSAMF ¶ 103.)  Plaintiff again wrote a rebuttal to the written warning and corrective action plan.  (Pl. Dep. 88, Ex. 12.)  That rebuttal,

---

[18] Although Plaintiff suggests some of these tardies may have been excused (*see* R-DSMF ¶¶ 75, 76), he has cited no evidence to support that his explanations were sufficient to excuse his late arrivals.  As such Defendants' statement of fact is deemed admitted.

however, consists of a single paragraph that fails to address any particular incident of tardiness or absenteeism, instead simply asserts without any support that "I have been on time and present with great attendance," and "my attended card for the year shows nothing but me being in the guidelines of the Fulton County Policy and Procedures." (*Id*. at 91-92, Ex. 12.)  However, Plaintiff admits that the records with the Sheriff Office accurately reflect when he was late and absent (*id*. at 72-73, 80-81, 100), and has not challenged the accuracy of Defendants' records showing his tardies and absences.[19]

In addition to his tardiness, Plaintiff was absent twelve times between January and March 2019, though Defendants do not provide any evidence about whether those absences were excused or not.  (DSMF ¶ 17; R-DSMF ¶ 17; Lee Decl. 17.)[20]  Plaintiff was also late again twice in March 2019, after the written warning was issued.  (Lee Decl. ¶ 17; *see also* DSMF ¶ 83; R-DSMF ¶ 83.)

Around February or March 2019, Capt. Taylor was transferred from the Fulton County Jail to supervise the detention officers at Grady.  (DSMF ¶ 79;

---

[19] That is, outside of maintaining that a 10-minute grace period applied to excuse many of his late arrivals.

[20] Although Plaintiff suggests some of these absences may have been excused (*see* R-DSMF ¶ 71; *see also* PSAMF ¶ 104), he has cited no evidence in support.

PSAMF ¶ 105.)  Upon her transfer to Grady, Capt. Taylor did her own independent review of the attendance history of all detention officers and other Sheriff's Office employees under her supervision, including Plaintiff, by reviewing their attendance cards and the Sheriff Office's electronic time keeping system.  (Taylor Dep. 27-30, 32-34; *see also* DSMF ¶ 80; R-DSMF ¶ 80; PSAMF ¶ 106.)  It does not appear Capt. Taylor spoke with Plaintiff; engaged Human Resources; searched for documentation about the absences, or reviewed the "excuses" he created in response to Sgt. Lee's warnings.  (Taylor Dep. 62, 68, 76; PSAMF ¶¶ 107-10.) Capt. Taylor testified that while she sometimes checks employees' excuses for tardiness and absenteeism, Plaintiff was out sick 62 times and tardy 23 times in a one-year period, and Capt. Taylor had been told by Lt. Cherry or Sgt. Lee that at least 10 to 20 of those instances were not excused.  (Taylor Dep. 67-70.)  Capt. Taylor testified that she noticed that Plaintiff was late to work an excessive amount and that Plaintiff had what she believed to be at least ten unexcused absences.  (*Id.* at 27, 33, 62, 70-73; *see also* DSMF ¶ 81; R-DSMF ¶ 81.)

### 9.    Plaintiff's Discharge

Because Plaintiff was a probationary employee, Capt. Taylor was required to make a recommendation about his continued employment.  (Taylor Dep. 41-43, 64-65, 73-75; *see also* DSMF ¶ 85; R-DSMF ¶ 85.)  She knew about his prior

attendance warnings and the Sheriff's Office's concerns about his attendance (*id.* at 71-73); and Capt. Taylor testified that, reviewing Plaintiff's attendance, she concluded that it was unacceptable, especially for a probationary employee, and recommended that his employment be terminated (*id.* at 41, 70, Ex 19; *see also*; DSMF ¶ 86). She then informed Major Jeffery Moffett that she would be "sending him a recommendation that Plaintiff's employment be terminated, and Moffett replied "send it up." (PSAMF ¶ 113.)[21] The parties appear to agree that, for summary judgment purposes, Capt. Taylor was the relevant decisionmaker with regard to Plaintiff's separation.

On or around March 27, 2019, Capt. Taylor sent her recommendation memo to Major Moffett, indicating that Plaintiff's attendance problems, even with "documentation supporting many of his absences," represented a "fail[ure] to maintain an acceptable job performance level."[22] (Taylor Dep. 63, Ex. 19; *see also* PSAMF ¶ 115.) Capt. Taylor believed she also sent the disciplinary warnings along with the recommendation. (Taylor Dep. 80.) At the time Capt. Taylor made her

---

[21] Capt. Taylor could not identify any further conversations she had with Moffett on the issue of Plaintiff's termination. (PSAMF ¶ 114.)

[22] Capt. Taylor had recommended that other probationary employees be terminated because of excessive absences. (Taylor Dep. 74-75; DSMF ¶ 89; R-DSMF ¶ 89.)

recommendation, she did not know Plaintiff had complained of discrimination. (DSMF ¶ 90.)

The following day, March 28, 2019, Major Moffett sent a memorandum to Colonel Leighton Graham, stating in part that "[b]ased on the information received from Captain Tyna Taylor" he concurred with the recommendation that Plaintiff be terminated.  (PSAMF ¶ 116.)  In early April 2019, Defendant Jackson terminated Plaintiff for alleged "excessive absenteeism and tardiness."  (PSAMF ¶ 117.)

## II.    PROCEDURAL HISTORY

On December 30, 2019, Plaintiff filed the present action.   [Doc. 1.] Following amendment, Plaintiff presently contends that his treatment, culminating in his discharge, amounts to discrimination and retaliation in violation of the Title VII, as well as discrimination in violation of the EPC, brought via 42 U.S.C. § 1983.[23]  [Doc. 14 ¶¶ 52-86.]  Plaintiff brings his Title VII claims against Sheriff Jackson[24]; the remaining EPC claim is asserted against all of the Defendants in

---

[23] Plaintiff does not assert a retaliation claim under the EPC.

[24] The amended complaint names the Sheriff's Office as the defendant with respect to Plaintiff's Title VII claims, but, as noted, Defendants have agreed that Sheriff Jackson, in his official capacity, is his legal employer for Title VII purposes and do not challenge the sufficiency of Plaintiff's pleading or claims against Sheriff Jackson on this point.

their official and individual capacities.  [*Compare*, Doc, 14 Counts I, II, *with id.*, Count III.]  On December 2, 2021, Defendants filed their motion for summary judgment.  [Doc. 56.]  Plaintiff has responded in opposition to the motion [Doc. 65], and Defendants have filed a reply [Doc. 66].  The motion is now ripe for resolution.

## III.   DISCUSSION

In their motion, Defendants seek summary judgment on each of Plaintiff's claims.  To start, Defendants argue that there are multiple reasons that Plaintiff's sexual orientation discrimination claims under both Title VII and the EPC fail. They first contend that most of the conduct he complains of—that is, besides his discharge—was not materially adverse and therefore cannot support a claim for relief under either Title VII or the EPC.  [*See* Doc. 56-1 at 5-12.]  Second, they argue that Plaintiff has not identified any similarly situated employee outside of Plaintiff's protected class who was treated more favorably, and thus, he cannot establish a prima facie case of discrimination.  [*Id.* at 12-13.]  Third, they argue that even if Plaintiff could establish a prima facie case of discrimination, Defendants had legitimate, nondiscriminatory reasons for their actions, and Plaintiff cannot establish that they were actually pretext for unlawful discrimination.  [*Id.* at 14-19.]

27

Defendants also set out multiple arguments for summary judgment on Plaintiff's retaliation claim.  They again argue that none of the allegedly retaliatory conduct was materially adverse [Doc. 56-1 at 20-21] and, additionally, that Plaintiff cannot establish that the relevant decisionmakers were even aware of his protected activity at the time they acted [*id.* at 21-22], but that even if they were, there were legitimate, nonretaliatory reasons for the employment decisions in question [*id.* at 22-23].

Finally, in their last argument for summary judgment, Defendants contend that Plaintiff's evidence fails to establish liability under 42 U.S.C. § 1983,[25] as he has not demonstrated that any adverse employment action was taken against him as part of a governmental policy or custom.  [Doc. 56-1 at 22-28.]

In his response, Plaintiff argues that genuine issues of material fact preclude summary judgment on each of his claims.  With regard to his discrimination claims, he first argues that he can establish that his transfer to Grady and his discharge were adverse actions, and that the remaining employment actions—"concerning Plaintiff's punctuality, leave, and attendances"—all "culminated in Plaintiff's termination" for attendance issues and are therefore actionable.  [Doc. 65 at 5-6.]

---

[25] *See generally Monell v. Dep't of Soc., Servs.*, 426 U.S. 658 (1978).

28

He then argues that he has identified comparators generally, and even if that evidence does not suffice to establish a prima facie case of discrimination under the normal single-motive analytical framework, he can still survive summary judgment because he can proceed under a mixed-motive theory and has, in any event, raised a convincing mosaic of circumstantial evidence of discrimination. [*Id.* at 6-8.]  Last, Plaintiff argues that he has set forth sufficient evidence to overcome Defendants' stated reasons for their actions and to create a triable issue on pretext (if such a showing is even necessary under a mixed-motive analysis).  [*Id.* at 8-11.]

Responding next to Defendants' arguments regarding his retaliation claim, Plaintiff again asserts that the adverse actions were material enough to satisfy the standard for such claims, that he can establish a causal connection between his protected activity and Defendants' conduct, and that his same pretext arguments should apply again to save his retaliation claim.  [*Id.* at 11-17.]

Finally, Plaintiff contends that each of the Defendants took "actions sufficient to at the least raise material issues of fact as to their liability" for EPC violations under 42 U.S.C. § 1983.  [Doc. 65 at 17-20.]

29

### A.   The Summary Judgment Standard

A court should grant summary judgment when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  The movant bears the initial burden of showing that it is entitled to summary judgment.  *Id.* ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (holding that *Celotex* did not change the rule that the movant bore the initial burden, and stating, "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial"). The movant may carry its burden by showing the court that there is "an absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. at 325.

"Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that

30

precludes summary judgment." *Clark*, 929 F.2d at 608.  The nonmovant is then required "to go beyond the pleadings" and to present competent evidence in the form of affidavits, answers to interrogatories, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quotation omitted); *see* Fed. R. Civ. P. 56(c).  "[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005). Resolving all doubts in favor of the nonmoving party, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  In evaluating a summary judgment motion, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor." *Id.* at 255.

### B.      Sexual Orientation Discrimination

As discussed, Defendants argue that Plaintiff's Title VII and EPC claims for discrimination are subject to summary judgment because (1) excepting his discharge, the actions complained of were not materially adverse, (2) Plaintiff has not identified any similarly situated comparators who were treated more favorably,

and (3) Plaintiff cannot demonstrate that their legitimate, nondiscriminatory reasons were pretext for unlawful discrimination. [Doc. 56-1.] The Court takes up the arguments in turn below.

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Similarly, "[t]he Equal Protection Clause of the Fourteenth Amendment prohibits race and sex discrimination in public employment," *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1312 (11th Cir. 2018) (citing *Williams v. Consol. City of Jacksonville*, 341 F.3d 1261, 1268 (11th Cir. 2003)), and when an EPC employment discrimination claim is brought via 42 U.S.C. § 1983, as Plaintiff's is, such "claims are subject to the same legal analysis" as those brought under Title VII,[26] *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d

---

[26] While neither the Supreme Court nor the Eleventh Circuit has explicitly found that the EPC will support a claim of sexual orientation discrimination, the parties assume as much, and between the Eleventh Circuit's holding extending the EPC's protections to transgender individuals in *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011), and the Supreme Court's decision finding sexual orientation discrimination tantamount to sex discrimination in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), the undersigned finds it appropriate for the Court to assume that a claim for sexual orientation discrimination sounds in the EPC via § 1983. *See also Izzard v. Cnty. of Montgomery, Pa.*, No. CV 21-418, 2021 WL 5639817, at

1227, 1235 (11th Cir. 2016) (using a Title VII legal framework to evaluate § 1983 sex discrimination claim) (citing *Rioux v. City of Atlanta*, 520 F.3d 1269, 1275 n.5 (11th Cir. 2008) and *Abel v. Dubberly*, 210 F.3d 1334, 1338 n.3 (11th Cir. 2000)). In order for Plaintiff to prevail on his discrimination claims, then, he must show that Defendants intentionally discriminated against him on the basis of his sexual orientation using direct evidence, statistical evidence that shows a pattern or practice of discrimination, or circumstantial evidence. *See Kilpatrick v. Tyson Foods, Inc.*, 268 F. App'x 860, 861 (11th Cir. 2008); *see also Denney v. City of Albany*, 247 F.3d 1172, 1182 (11th Cir. 2001) (citing *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000)). Because Plaintiff has presented no direct evidence of discrimination (nor statistical evidence), he must prove discrimination through circumstantial evidence.

### 1.   *McDonnell Douglas* Framework

One way to demonstrate a viable employment discrimination claim at summary judgment using circumstantial evidence is through the familiar burden-shifting analysis set forth in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973).

---

*10 (E.D. Pa. Nov. 29, 2021) (analyzing and concluding that sexual orientation is a quasi-suspect class deserving of heightened scrutiny under the EPC).

33

*See Holifield*, 115 F.3d at 1561-62. Under that framework, the plaintiff first has the burden of establishing a prima facie case of discrimination. *Chapman*, 229 F.3d at 1024. To do so, a plaintiff must generally show that (1) he belongs to a protected class; (2) he was qualified to do the job; (3) he was subjected to an adverse employment action; and (4) that the defendant treated similarly situated employees outside his protected class more favorably. *Maynard v. Bd. of Regents of Div. of Univ. of Fla. Dep't of Educ. ex rel. Univ. of S. Fla.*, 342 F.3d 1281, 1289 (11th Cir. 2003). If the plaintiff meets his burden, the burden shifts to the defendant to articulate legitimate, nondiscriminatory reasons for the adverse employment action. *Chapman*, 229 F.3d at 1024. This burden is one of production, not persuasion, and is "exceedingly light." *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994). The plaintiff is then given a final opportunity to show that the defendant's proffered nondiscriminatory reasons were merely a pretext for discriminatory intent. *Chapman*, 229 F.3d at 1024.

Here, Defendants argue that Plaintiff cannot establish either the third or fourth elements of his prima facie case—that is, that he suffered any adverse employment action or that he has set forth evidence that other employees outside his class were treated more favorably—or that he can establish pretext.

### a.     Adverse Actions

Taking up the materiality question first, it appears that Plaintiff has alleged that the following actions were purportedly discriminatory and actionable:  his short-term reassignment to third floor in August 2018, his temporary shift-based reassignment to various floors soon after, the issues over his vacation, the warning he received about fraternizing with inmates, his transfer to Grady (with its attendant parking and overtime issues), and his discharge.[27]

Title VII prohibits discrimination with respect to an employee's "compensation, terms, conditions, or privileges of employment," 42 U.S.C. § 2000e-2(a), and courts have interpreted this provision to require that a plaintiff

---

[27] Plaintiff's amended complaint asserts that the following amounts to unlawful discrimination:  Wilson's "disparaging remarks," and the "adverse transfer and schedule changes," a "false accusation of misconduct," transferring him to Grady, "subjecting him to unwarranted disciplinary actions," and "terminating his employment." [Doc. 14 ¶¶ 57, 81, 82.]  The foregoing list in the body above appears to encompass all of these generally-described adverse actions (outside of his coworker, Wilson's remarks), and Plaintiff's response does not identify any additional conduct as discriminatory and actionable. [*See* Doc. 65 at 5-6 (specifically identifying only that his transfer to Grady and his discharge were sufficiently adverse, and suggesting that the remaining actions "concerning Plaintiff's punctuality, leave, and attendance . . . culminat[ed] in Plaintiff's termination [and are therefore] adverse actions").]  As for Wilson's statement, Plaintiff does not now contend that it amounted to an actionable hostile work environment, or otherwise suggest it is actionable in its own right.

establish that he suffered a "so-called 'adverse employment action.'" *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1238 (11th Cir. 2001). "To prove an adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment," such that it is "materially adverse as viewed by a reasonable person in the circumstances." *Holland v. Gee*, 677 F.3d 1047, 1057 (11th Cir. 2012) (cleaned up) (quoting *Davis*, 245 F.3d at 1239 (internal marks omitted)). While "direct economic consequences" are an important factor in determining whether an action is materially adverse, monetary damages are not required "in all cases," and actions can be considered adverse if they involve significant and material "reductions in pay, prestige or responsibility." *Id.* (quoting *Hinson v. Clinch Cnty. Bd. of Educ.*, 231 F.3d 821, 829 (11th Cir. 2000) (internal marks omitted); *see also Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1203 (11th Cir. 2013) (explaining that the "loss of . . . responsibilities" is not a material change absent a showing of "significantly different responsibilities" (citation and internal quotation marks omitted)). In any event, the "impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment."

*Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 921 (11th Cir. 2018) (citing *Davis*, 245 F.3d at 1239).

The undersigned addresses the foregoing employment actions in chronological order, starting with Plaintiff's temporary reassignment to the Jail's third floor and his shift-based reassignment on multiple occasions after he was returned to the fourth floor.  Plaintiff does not argue in his opposition brief that these were adverse actions, instead arguing only that his transfer, reprimands for attendance problems, and discharge were.  [Doc. 65 at 5-6.]  Because his response fails to address these reassignments, any claim based upon them should be deemed abandoned.  *See Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("Grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.") (citing *Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994)); *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned when argument not presented in initial response to motion for summary judgment); *see also Cusick v. Yellowbook, Inc.*, 607 F. App'x 953, 954 n.1 (11th Cir. 2015) (citing *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318-19 (11th Cir. 2012)) ("[The plaintiff] also raised claims for association discrimination . . .

However, he did not address these claims in his response to [the defendant's] motion for summary judgment, and the district court properly deemed them abandoned.").

But even assuming that they were not abandoned, Plaintiff still has not identified any significant differences in eligibility for pay, responsibility, or prestige associated with the various reassignments in August and September 2018; has not pointed to any differences in the underlying work or his job duties; and has not suggested the transfer amounted to a demotion or change in rank.  The only change Plaintiff highlights is that he had more overtime available during the weeks he was assigned to the third floor,[28] and that as a result, (1) he was paid more,[29] and (2) he was sometimes tired when he had to bring his daughter to school and/or pick her up during that short period of time.  But Plaintiff does not even attempt to identify how much more overtime he had to work (either by the overall number of additional hours or based upon how many occasions he worked additional overtime), has offered nothing but his own purely personal circumstances to

---

[28] Of course, Plaintiff complains that his transfer to Grady was an adverse action precisely because he had *less* overtime available.

[29] Indeed, Plaintiff testified that he "didn't have an issue with my pay" when he was transferred to the third floor.  (Pl. Dep. 34.)

explain why the change in schedule—for approximately three weeks in August—was inconvenient, and therefore ultimately fails to explain how some additional overtime during a few shifts amounts to "serious and material" change in the terms in his employment. *See Webb-Edwards v. Orange Cnty. Sheriff's Office*, 525 F.3d 1013, 1033 (11th Cir. 2008). More than that, Plaintiff leaves entirely unrebutted Defendants' evidence that he worked roughly the same amount of overtime during those weeks as he had previously. [*See* Lee Decl. Ex A (showing that Plaintiff worked between one and three shifts that included overtime per week in the weeks prior to his third floor reassignment, between zero and two shifts per week while stationed on the third floor, and between zero and two shifts per week in the weeks after he was returned to the fourth floor).] Even viewing this evidence in the light most favorable to Plaintiff, the undersigned cannot say that Plaintiff has offered sufficient evidence that these reassignments were anything more than temporary, lateral reassignments that involved no material diminution of pay or demotion in form or substance. *Doe v. DeKalb County Sch. Dist.*, 145 F.3d 1441, 1448-49 (11th Cir. 1998) ("[I]t is not enough that a transfer imposes some de minimis inconvenience or alteration of responsibilities."); *Clark v. S. Broward Hosp. Dist.*, 601 F. App'x 886, 893 (11th Cir. 2015) (one month with personally undesired shift

39

assignments was not adverse); *Osahar v. Postmaster Gen. of U.S. Postal Serv.*, 263 F. App'x 753, 762 (11th Cir. 2008) (reassignment with roughly "comparable" amount of overtime was not adverse); *Foster v. Thomas Cnty.*, 927 F. Supp. 2d 1350, 1357 (M.D. Ga. 2013) (finding that when a temporary transfer to the night shift was viewed as adverse for "purely personal reasons" and not because it was demonstrably "more arduous," it did not meet Title VII's materiality threshold) (citing *McGowan v. City of Eufala*, 472 F.3d 736 (10th Cir. 2006)); *see also Benningfield v. City of Houston*, 157 F.3d 369, 377 (5th Cir. 1998) (determining that a transfer to the night shift, without more, did not constitute an adverse action). Accordingly, Defendants are entitled to summary judgment with regard to any claim arising out of these temporary reassignments.

Plaintiff next complains about the issues he had getting his vacation time approved (when he had insufficient vacation hours to cover it). Again, however, he has offered no argument in his response brief to Defendants' argument that, because he still took off the same time off (and more), he suffered no tangible employment impact. As a result, any claim based upon Lt. Cherry not approving his vacation time ought to be deemed abandoned. *Resol. Tr. Corp.*, 43 F.3d at 599; *Wilkerson*, 270 F.3d at 1322. Regardless, the withholding of approval of vacation

leave pursuant to an employer's policy, without more, typically does not amount to an actionable change in the terms of employment, particularly when the denial is an isolated incident and the plaintiff is still able to take a reasonable amount of vacation. *See Thrasher v. Vertex Aerospace, LLC*, No. 3:03CV437/RV, 2005 WL 2044943, at *12 (N.D. Fla. Aug. 23, 2005) (collecting cases); *see also McGregor v. Gencor Indus., Inc.*, No. 618CV2045ORL22EJK, 2020 WL 6928195, at *10 (M.D. Fla. July 22, 2020) ("Thus, the denial of additional vacation time, standing alone, is not sufficient to establish a retaliation claim."); *Wynn v. Paragon Sys., Inc.*, 301 F. Supp. 2d 1343, 1354 (S.D. Ga. 2004) (A one-time denial of an employee's vacation request does not qualify as a serious and materially adverse change in the terms and conditions of her employment).[30]  This is particularly true when the denial is made pursuant to employer policy, even if the plaintiff "disagreed or disliked" that policy. *See Bozeman v. Per-Se Techs., Inc.*, 456 F.

---

[30] *Thrasher* was decided in relation to a retaliation claim, *see* 2005 WL 2044943, at *12; however, that opinion was handed down before the Supreme Court's ruling *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), finding that retaliation claims were subject to a different materiality threshold than discrimination claims.  As a result, the *Thrasher* opinion applied the same materiality standard as should be applied here. *See Crawford v. Carroll*, 529 F.3d 961, 971 (11th Cir. 2008) ("Regardless of the different terminology used, the applicable standard appears to be the same.").

Supp. 2d 1282, 1344 (N.D. Ga. 2006); *see also Johnston v. Henderson*, 144 F. Supp.

2d 1341 (S.D. Fla. 2001) (holding improper denial of sick leave did not rise to the

level of an adverse employment action).  That Plaintiff was in fact able to take all

the time off he wanted simply underscores the conclusion that Lt. Cherry's "denial"

of his request was not a materially adverse employment action, and summary

judgment should thus be granted on any claim premised upon it.

Turning next to Plaintiff's reprimand for fraternizing with inmates, Plaintiff

again fails to respond to Defendants' argument that the threatened discipline, which

was rescinded before it could be implemented, was not adverse.  For this reason,

any claim based upon the conduct should again be needed abandoned.  *Resol. Tr.*

*Corp.*, 43 F.3d at 599; *Wilkerson*, 270 F.3d at 1322.  But even considering the

merits, the Eleventh Circuit has indicated that workplace discipline and reprimands

do not typically constitute adverse employment actions unless they are also coupled

with evidence that the alleged discipline actually impacted the plaintiff's pay, title,

position, or job duties.  *See, e.g., Summerlin v. M & H Valve Co.*, 167 F. App'x 93,

97 (11th Cir. 2006) ("The reprimand of an employee does not constitute an adverse

employment action when the employee suffers no tangible harm as a result."); *see*

*also Barnett v. Athens Reg'l Med. Ctr., Inc.*, 550 Fed. Appx. 711, 713 (11th Cir.

2013) ("We have held that memoranda of reprimand or counseling that amount to no more than a mere scolding, without any following disciplinary action, do not rise to the level of adverse employment actions sufficient to satisfy the requirements of Title VII.") (internal quotation omitted).  Because Plaintiff has offered no evidence or argument that the reprimand for fraternizing with inmates resulted in any tangible impact on the terms of his employment, any claim based upon the reprimand is also subject to summary judgment.

This leaves Plaintiff's transfer to Grady to address.[31]  Defendants contend that the move "did not negatively impact his pay, his prestige, his title, etc." and note that other workers, including Lt. Cherry and Defendant Taylor, were also transferred without complaint.  [Doc. 56-1 at 10-11.]  However, Defendants' opening brief fails to even acknowledge that Plaintiff has testified that he was denied the ability to even work overtime hours at the Jail and that his pay decreased as a result.  As set forth above, isolated instances of *extra* overtime work are not generally considered to be materially adverse, assuming they come with extra pay; however, "*reductions* in overtime," that result in a "withheld financial benefit" will.

---

[31] As noted, Defendants concede that Plaintiff's discharge (and the events leading up to it) was sufficiently adverse to be actionable.

*Amos v. Tyson Foods, Inc.*, 153 F. App'x 637, 645 (11th Cir. 2005) (citing *Bass v. Bd. of Cnty. Commr's*, 256 F.3d 1095, 1118 (11th Cir. 2001)); *see also Brown v. Bibb Cnty. Props., LLC*, 602 F. App'x 755, 758 (11th Cir. 2015) (finding that the denial of "the opportunity to work overtime hours" was an adverse action); *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 715 (11th Cir. 2002) (observing that the denial of overtime opportunities constitutes an adverse employment action for Title VII purposes).   Here, Plaintiff has testified unequivocally that his opportunity to perform overtime was diminished following his transfer to Grady; that he complained about it to Lt. Cherry, asking for overtime work at the Jail; that while other detention officers were allowed to work overtime at the Jail, he was not; and that his finances suffered as a result.  (*See* Pl. Dep. 50-53, Ex. 14 (Plaintiff's responses to Defendants' interrogatories) at 10.)  Defendants' only response is to point out that Plaintiff in fact worked some overtime while at Grady, and that some of the weeks he did not work overtime was a result of his absences.  [*See* Doc. 66 at 4.]  However, as the Eleventh Circuit has repeatedly held, the mere denial of an "opportunity to work overtime hours" is sufficient to be actionable, *Brown*, 602 F. App'x at 758, even where the actual reduction in overtime work is attributable "in part" to unrelated causes, *Shannon*, 292 F.3d at

44

714.  At a minimum, Plaintiff has raised a genuine question of material fact about whether his transfer was materially adverse, and summary judgment should not be granted on this basis.

### b.    Comparator Evidence

Defendants next argue that Plaintiff cannot establish a prima facie case of discrimination because he has not presented evidence of a proper comparator who was treated more favorably, and therefore cannot raise an inference that Defendants' actions were discriminatory.  [Doc. 65 at 12-13.]  In relation to his transfer and discharge,[32] Plaintiff responds that he was overlooked for overtime but "other detention officers at Grady were being sent to the jail to work overtime hours" and that he has "observed that other officers with whom he worked had similar attendance records but were not written up or terminated" [Doc. 65 at 6-7]; however, Plaintiff still fails to offer any specific testimony or other evidence that identifies a single comparator by name or description.

To make out a prima facie case of discrimination based on comparator evidence, "a comparator must be 'similarly situated in all material respects,'"

_____

[32] For the reasons set forth above, these are the only two adverse actions at play to support Plaintiff's discrimination claims.

45

meaning that the plaintiff and comparators are 'sufficiently similar, in an objective sense, that they cannot reasonably be distinguished.'" *Earle v. Birmingham Bd. of Educ.*, 843 F. App'x 164, 166 (11th Cir. 2021) (quoting *Lewis v. City of Union City*, 918 F.3d 1213, 1218, 1228 (11th Cir. 2019) (en banc)). The determination as to whether an individual is similarly situated is highly case-specific; however, "a similarly situated comparator will ordinarily (1) have engaged in the same basic conduct as the plaintiff; (2) have been subject to the same employment policy, guideline, or rule as the plaintiff; (3) have been under the jurisdiction of the same supervisor as the plaintiff; (4) and share the plaintiff's employment history." *Id.* (citing *Lewis*, 918 F.3d at 1227-28). Significantly for the present case, a "plaintiff's failure to produce evidence showing that a single similarly situated employee was treated more favorably will preclude the establishment of a prima facie case." *Id.*

Here, Plaintiff's evidence falls woefully short of fulfilling this burden. While Plaintiff generally asserts that there were other Sheriff's Office employees who likely worked more overtime or who might have been absent on a comparable basis but were not disciplined or discharged, he has not identified a single one,

46

either by name or description[33]; has not explained how their purportedly offending conduct was similar to his own; has not identified their supervisors or any relevant decisionmaker that they shared; and has not described their employment history in any shape or form, much less offered evidence about how they were substantially similar.  Without more, Plaintiff's conclusory comparator testimony will not raise an inference of discrimination or otherwise support a prima facie case with regard to his transfer or discharge.  *See Jones v. Spherion Atl. Enters., LLC*, 493 F. App'x 6, 9 (11th Cir. 2012) (finding statement that "supervisor publicly embarrassed black women by rudely reprimanding them for violations, while ignoring the same violations of white women even after the white women's violations were pointed out to him" to be "conclusory" and "unsupported by any specifics"); *see also Adams v. McDonald*, No. 1:13CV235-MW/GRJ, 2014 WL 6453552, at *6 (N.D. Fla. Nov. 17, 2014) (deposition testimony echoing complaint allegations that "white counterparts did not experience the same treatment" without specific factual support falls short of showing comparator evidence of discrimination).  Accordingly, Plaintiff cannot make out a prima facie case of discrimination in

---

[33] Plaintiff also admitted that when he was having discussions with Sgt. Lee about his attendance issues, he never identified any other individuals that he felt should have been disciplined based upon similar infractions.  (Pl. Dep. 99.)

47

relation to any of the complained-of conduct under the *McDonnell Douglas* framework.  Summary judgment should therefore be **GRANTED** as to any single-motive discrimination claims Plaintiff has asserted in this case.[34]

## 2.   Alternative Analytical Frameworks

Likely anticipating the Court's conclusion about his comparator evidence,[35] Plaintiff briefly argues that he can still survive summary judgment on his discriminatory transfer and discharge claims under a mixed-motive theory or based upon a convincing mosaic of circumstantial evidence.[36]  [*See* Doc. 65 at 8, 12.]

---

[34] Because Plaintiff cannot establish a prima facie case of discrimination, the Court need not analyze Defendants' proffered legitimate, nondiscriminatory reasons for Plaintiff's transfer and discharge—staffing needs and attendance issues, respectively—or evaluate the evidence Plaintiff presents to argue that those reasons were pretext for discrimination.  Even so, the Court addresses that pretext evidence in the following section in relation to Plaintiff's argument that the evidence can also establish a mixed-motive claim of discrimination, and explains why it does not create a material issue of discriminatory intent.  The Court also takes it up in relation to Plaintiff's argument that it establishes pretext for retaliation.

[35] [*See* Doc. 65 at 8 ("[T]hough Plaintiff has identified comparators, even if the Court were to determine he has not, a plaintiff's failure to produce a comparator is not necessarily fatal for the plaintiff's case.").

[36] Plaintiff's arguments on this point do not implicate the remaining conduct raised by his discrimination claims (or the undersigned's recommendation that summary judgment be granted on them), because regardless of the analytical framework, a discrimination plaintiff is always required to demonstrate that the offending conduct was a materially adverse. *Quigg*, 814 F.3d at 1242. As discussed immediately above, Plaintiff has only raised a triable issue on this in relation to his transfer to Grady and discharge.

### a.      Mixed Motive Analysis

Plaintiff's opposition brief is almost entirely centered on the single-motive, *McDonnell Douglas* framework, and only piggybacks a mixed-motive argument on top of that theory by referencing his pretext arguments.  [*See id.* at 12.]  But because Plaintiff references discriminatory intent as a "motivating factor" in his amended complaint [*see* Doc. 14 ¶ 58] and because Defendants do not challenge Plaintiff's ability to proceed under a mixed-motive or motivating factor theory here, the Court will assume that he can.  *But see*, *Smith v. Vestavia Hills Bd. of Educ.*, 791 F. App'x 127, 130 (11th Cir. 2019) ("[A] plaintiff cannot make only a "passing reference to a mixed-motive theory" to sufficiently raise the issue.") (citing *Keaton v. Cobb Cnty.*, No. 08-11220, 2009 WL 212097, at *10 (11th Cir. Jan. 30, 2009)); *Benjamin v. SNF Holding Co.*, 602 F. App'x 758, 762 (11th Cir. 2015) ("Where . . . a[n employee] puts forth only circumstantial evidence in support of his discrimination claims," the *McDonnell Douglas* framework generally applies.); *Williams v. Fla. Atl. Univ.*, No. 15-60621-CIV, 2017 WL 1881676, at *5 (S.D. Fla. May 9, 2017), *aff'd*, 728 F. App'x 996 (11th Cir. 2018) ("Now, in response to Defendants' motions for summary judgment, Plaintiff raises, for the first time, a mixed-motive theory of discrimination. . . .  Plaintiff's insistence that she was fired

49

solely because of an illegitimate reason precludes her from proceeding under a mixed-motive theory.") (citing *Johnson v. Young*, Case No. 4:15-cv-543-RH/CAS, 2016 WL 4536406 at *3 (N.D. Fla. Aug. 30, 2016)).

In contrast to single-motive claims, which are analyzed under the *McDonnell Douglas* framework, a plaintiff can succeed on a mixed-motive claim by showing that illegal bias, such as bias based on sexual orientation, "was a motivating factor for" an adverse employment action, "even though other factors also motivated" the action. *See Quigg*, 814 F.3d at 1235 (citations omitted). To survive summary judgment, then, a plaintiff need only offer evidence that (1) the "defendant took an adverse employment action against the plaintiff; and (2) a protected characteristic was a motivating factor for the defendant's adverse employment action." *Id.* at 1239 (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008)). "In other words, the court must determine whether the 'plaintiff has presented sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that [Plaintiff's sexual orientation] was a motivating factor for an

adverse employment decision.'"  *Id.* (cleaned up) (quoting *White*, 533 F.3d at 400).[37]

Given that Plaintiff has offered sufficient evidence that his transfer to Grady and discharge were adverse employment actions, the "only question" before the Court is whether he has also presented sufficient evidence for a reasonable jury to conclude that his sexual orientation was a motivating factor for the move or his firing.  Plaintiff points to the following evidence[38] to support his mixed-motive theory:

- Lt. Richardson testified that Plaintiff was a "good employee" and never had attendance issues in his time under Lt. Richardson;

- Plaintiff was subject to a discriminatory remark by Wilson;

---

[37] Of course, proceeding under a mixed-motive theory presents a defendant with an opportunity to make the "same decision" defense:  "Section 2000e–5(g)(2)(B) of Title VII provides that if an employer can demonstrate it 'would have taken the same action in the absence of the impermissible motivating factor, the court . . . shall not award damages' or certain equitable relief."  *Quigg*, 814 F.3d at 1242.

[38] Again, this evidence was offered up by Plaintiff to demonstrate that Defendants stated reasons for his transfer and firing were pretextual [*see* Doc. 65 at 7-12]; it is only incorporated by reference into his mixed-motive argument [*see id.* at 12].

- Plaintiff's initial complaints to Lt. Cherry and Sgt. Sanders did not result in Wilson being separated from Plaintiff;

- Lt. Richardson and Sgt. Sanders failed to sufficiently support the contention that "safety" or staffing needs warranted Plaintiff's temporary reassignment to the third floor;

- Plaintiff had never been written up for attendance issues before making a complaint of discrimination;

- Sgt. Sanders wrote Plaintiff up for taking time off HR had approved;

- Lt. Cherry denied Plaintiff's request for leave;

- he was threatened with discipline for fraternization after complaining of discrimination;

- Lt. Mayo began to monitor Plaintiff and question him about his work after he complained about Wilson's statements;

- Plaintiff was denied overtime following his transfer to Grady, which other similarly situated employees received;

- Plaintiff was disciplined and fired for "attendance and punctuality issues," while observing that "other officers with whom he worked had similar attendance records but were not written up"; and

- Capt. Taylor's discharge recommendation was based upon input from Sgt. Lee and Lt. Cherry without an "independent inquiry."

[Doc. 65 at 9-11.]

Unfortunately for Plaintiff, almost none of these items appear causally related to either his transfer or his discharge, and thus, could not be said to have motivated them.  And to the extent any of them are causally related, they only seem to suggest a retaliatory motive rather than discrimination based upon sexual orientation.[39]  Starting with Lt. Richardson's comment and Plaintiff's prior lack of attendance problems, the mere fact that Plaintiff did not have attendance problems under Lt. Richardson is irrelevant to whether he had attendance problems elsewhere, and Plaintiff admitted both that his problems with attendance were largely a result of the parking situation *after* his transfer and that Defendants' records about his attendance were in fact correct.  (*See* Pl. Dep. 72-76, 80-85, 99-101.)  In any event, this fact says nothing that implicates Plaintiff's sexual orientation or even impugns anyone's truthfulness; much less their truthfulness about the reasons for Plaintiff's transfer or discharge.  Turning next to Wilson's comment, the Eleventh Circuit has

---

[39] For these same reasons, these items would not establish pretext under the *McDonnell Douglas* framework.

53

been clear that "[e]vidence of discriminatory comments by non-decisionmakers unrelated to the employment decision at issue is generally 'too weak to raise a genuine fact issue,'" even when proceeding under a mixed-motive theory. *Williams v. Hous. Auth. of Savannah, Inc.*, 834 F. App'x 482, 490 (11th Cir. 2020) (citing *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1268 (11th Cir. 2010)). There is also no evidence that any supervisory employee adopted or condoned Wilson's statement; indeed, to the extent anyone investigating questioned Plaintiff's complaint, it was only to ask whether the alleged statement had in fact been made, not whether it was inappropriate or wrong if it had. As a result, without more, neither Lt. Richardson's nor Wilson's sentiments moves the needle with respect to demonstrating discriminatory intent for his transfer and discharge months later.

The things Plaintiff complains about next appear to bear on the question of retaliatory motive, but Plaintiff has not linked any of that conduct to a discriminatory motive. Plaintiff complains that Wilson was not moved immediately after his complaint,[40] that his supervisors provided an insufficiently

---

[40] It is undisputed that the Sheriff's Office moved Wilson away from the fourth floor after it returned Plaintiff there.

detailed justification for his temporary shift reassignments after his complaint, that he was threatened with unwarranted discipline (in relation to the serving orderlies) after his complaint, and that a new supervisor (Lt. Mayo) began to monitor him after his complaint.  Plaintiff does not explain how or why he contends that any of this conduct was tied to his sexual orientation, and instead simply sets forth the list as if it were self-evidently proof of discrimination.  But looking closer at each, it appears that they are not.  That Wilson was not moved immediately following Plaintiff's complaints appears—based upon the evidence presented to the Court— to simply be a function of how the Sheriff's Office investigated his complaint. Plaintiff admits that he had never known Wilson to make such comments, and that Wilson denied making the comment to him.  (Pl. Dep. 15-16; DSMF ¶ 26.)  Lt. Cherry, meanwhile, testified that she spoke with Wilson after Plaintiff's complaint, but that he denied saying anything; she therefore chalked the situation up to gossip and emailed the floor to tell them it would not be tolerated.  (Cherry Dep. 65-68.) Sgt. Sanders, who became the floor leader in late June 2018, told Plaintiff after he complained that she would speak with Lt. Richardson, and about a week later, Lt. Richardson, Sgt. Sanders, Plaintiff, and Wilson in fact met, after which Lt.

Richardson conducted a more fulsome investigation and separated the two.[41] (PSAMF ¶¶ 18-24; DSMF ¶¶ 31-33.)  Plaintiff does not explain how they should have acted differently, much less justified his insinuation that Lt. Cherry and Sgt. Sanders should have moved or otherwise disciplined Wilson without any investigation.  *See Alexander v. Fulton Cnty.*, 207 F.3d 1303, 1341 (11th Cir. 2000) ("[I]t is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not [improperly] motivated.").  That he was then temporarily moved and provided only a short statement that the moves were for his safety and based upon staffing needs also does not transparently suggest discriminatory motive; and the fact that he was returned to the fourth floor after he complained about the move to Capt. Arnold also undercuts an inference that the reassignments were made on a discriminatory basis.  In any event, Plaintiff fails to explain how these actions bear on his transfer to Grady months later or his discharge several months after that, and only ties them to his complaint about discrimination.

---

[41] Sgt. Sanders was also disciplined for failing to act quicker on the complaint.

Plaintiff next raises the threatened discipline and the denial of his vacation request.  While he has offered some evidence that the threatened discipline was unwarranted under the Jail's normal practices, he has not offered anything to suggest that the threat was motivated by his sexual orientation; instead, he simply notes that it was suspicious given its timing relative to his complaint of discrimination.  *Cf. St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (undercutting an employer's explanation for an action does not demonstrate discrimination "unless it is shown both that the reason was false, and that discrimination was the real reason").  But to the extent this sort of circumstantial evidence suggests any improper animus, it suggests retaliation for Plaintiff having made his complaint, not discrimination based upon Plaintiff's sexual orientation. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (close temporal proximity between protected activity and adverse action is evidence of causation for retaliation claims).  All indications are that Plaintiff and his husband, who both worked at for the Sheriff's Office, were open about their sexual orientation,[42] and Plaintiff has not offered any evidence that any supervisory staff

---

[42] Plaintiff does not identify anyone at the Sheriff's Office who he contends did not know he was gay before the events of July and August 2018.

first learned that Plaintiff was gay as a result of his complaints. Accordingly, there is no reason to think that anyone suddenly decided to change how they treated him based upon previously known facts about him. The same goes for Sgt. Sanders's write-up for time off, Lt. Cherry's denial of a vacation request, and Lt. Mayo's monitoring: Plaintiff offers no argument or further evidence to explain how these implicated his sexual orientation other than to note the suspicious timing relative to his complaint, which again, is circumstantial evidence of retaliation, not discrimination. Moreover, Plaintiff has not offered evidence that Sgt. Sanders was aware of HR's approval of the time off; that Lt. Cherry's explanation for the denial—that he had insufficient vacation time—was not an honestly held belief on her part (or that it was even inaccurate); or that Lt. Mayo, as his new supervisor, should not have been monitoring him. Without more, the undersigned is at a loss for how this sequence of events begins to show that Plaintiff was transferred or fired based upon his sexual orientation.

Finally, Plaintiff's so-called comparator evidence—already addressed in relation to Plaintiff's prima facie case under the *McDonnell Douglas* framework—fails to demonstrate anything. Plaintiff has testified conclusorily that others were treated more favorably, but fails to provide any relevant identifying information to

establish who they were or even that they were similarly situated to him, and as a result, no inference of discrimination arises.  *See Earle*, 843 F. App'x at 166; *Spherion*, 493 F. App'x at 9; *Adams*, 2014 WL 6453552, at \*6.

In the end, Plaintiff has failed to provide sufficient evidence for a jury to find, by a preponderance of the evidence, that his sexual orientation was a factor his transfer or firing, and summary judgment should be **GRANTED** on his mixed-motive discrimination claims to the extent he has asserted them.[43]

### b.    Convincing Mosaic

In his final argument in support of his discrimination claims, Plaintiff suggests that he can still defeat summary judgment because he has provided "abundant circumstantial evidence" from which a jury could conclude he was discriminated against.  [Doc. 65 at 8.]

In certain cases, a "convincing mosaic of circumstantial evidence" may be sufficient to allow a jury to infer that discriminatory intent motivated an employment decision, and can allow a plaintiff to survive summary judgment when he might not under the standard *McDonnell Douglas* framework.  *See Smith v.*

---

[43] As noted above, this same analysis would apply to dispel any argument that Defendant's stated reasons for its employment decisions were pretext for discrimination.

*Lockheed-Martin Corp.*, 644 F.3d 1321, 1328-29 (11th Cir. 2011).  Typically, it is utilized in circumstances when a plaintiff lacks comparator evidence because there are no other similarly situated individuals, allowing the plaintiff to bypass the presentation of a prima facie case.

Since *Lockheed-Martin*, the Eleventh Circuit has recognized three categories of circumstantial evidence that may be relevant under the convincing mosaic approach:  "(1) suspicious timing, ambiguous statements, similar behavior directed at other members of the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn; (2) systematically better treatment of those outside the protected class; and (3) pretext in the employer's justification."  *Smith v. City of New Smyrna Beach*, 588 F. App'x 965, 976 (11th Cir. 2014) (citing *Lockheed-Martin*, 644 F.3d at 1328).  This convincing mosaic of circumstantial evidence can substitute for either a prima facie case of discrimination or a demonstration of pretext.  *King v. Ferguson Enters., Inc.*, 971 F. Supp. 2d 1200, 1217-18 (N.D. Ga. 2013), *aff'd*, 568 F. App'x 686 (11th Cir. 2014).

Plaintiff's approach in support of his convincing mosaic theory is to simply to point to the same evidence cited immediately above, and assert it is sufficient

60

under *Lockheed-Martin* without additional explanation. [Doc. 65 at 8.] But as the Court has already belabored, Plaintiff has not presented evidence that tends to show any complained of action was motivated by his sexual orientation, as opposed to his protected activity, much less that there were any efforts to discriminate systematically against gay people. Plaintiff's new framing of the same evidence simply fails to support a different conclusion, and summary judgment should therefore be **GRANTED** on all of Plaintiff's discrimination claims, regardless of the analytical framework.

In conclusion, all of Plaintiff's discrimination claims—whether asserted under Title VII or the EPC—are subject to summary judgment, either because they do not amount to an adverse employment action, or because Plaintiff has failed to support his claims with evidence that establishes discriminatory animus.[44]

### C.   Retaliation

The Court next takes up the remaining claim, Plaintiff's Title VII claim for retaliation. Defendants argue the claim fails because (1) again, excepting his

---

[44] Because the undersigned recommends that summary judgment be granted to Defendants on Plaintiff's EPC claim, there is no need to address Defendants' further arguments that Plaintiff's evidence is insufficient to establish liability under 42 U.S.C. § 1983.

discharge, the actions complained of were not materially adverse, (2) Plaintiff cannot demonstrate a causal connection between his protected activity and any of the adverse actions because the relevant decisionmakers were unaware of his protected activity at the time, and (3) Plaintiff cannot demonstrate that their legitimate, nondiscriminatory reasons were pretext for unlawful retaliation. [Doc. 56-1 at 22-28.]

## 1.    Analytical Framework

In addition to discrimination, Title VII prohibits retaliation against an employee "because [s]he has opposed any practice made an unlawful employment practice by [Title VII], or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."  42 U.S.C. § 2000e-3(a).[45]  When an employee relies on circumstantial

---

[45] Plaintiff has not asserted a claim of retaliation pursuant to the EPC, nor could he.  *See Watkins v. Bowden*, 105 F.3d 1344, 1354-55 (11th Cir. 1997) (affirming trial court's grant of a directed verdict for defendants on plaintiff's equal protection retaliation claim under § 1983 because "[a] pure or generic retaliation claim . . . simply does not implicate the Equal Protection Clause.") (citations omitted); *see also Owens v. Jackson Cnty. Bd. of Educ.*, 561 F. App'x 846, 848 (11th Cir. 2014) ("Harding contends that the district court erred by denying summary judgment on Owens' Fourteenth Amendment retaliation claim.  This Court has held that a claim of gender-based retaliation 'simply does not implicate the Equal Protection Clause.'"); *Ratliff v. DeKalb Cnty.*, 62 F.3d 338, 340-41 (11th Cir. 1995) ("[T]he right to be free from retaliation is clearly established as a first

evidence to show retaliation under Title VII, she must first establish a prima facie case of retaliation by showing that (1) she engaged in statutorily protected activity, (2) she suffered an adverse employment action, and (3) there is some causal connection between the two events. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). Unlike substantive discrimination, there is no option to pursue a mixed-motive or motivating factor theory in the retaliation context. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

After a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to produce legitimate reasons for the adverse employment actions. *Johnson v. Booker T. Washington Broad. Serv.*, 234 F.3d 501, 507 n.6 (11th Cir. 2000). If the defendant offers legitimate reasons, the plaintiff must respond by showing that the employer's reasons are actually pretext for unlawful retaliation. *Id.*

### 2.    Adverse Actions

Title VII retaliation claims are subject to a different—and lower— materiality threshold than discrimination claims. Specifically, a complained-of

---

amendment right and as a statutory right under Title VII; but no clearly established right exists under the equal protection clause to be free from retaliation.").

63

employment action need only be able to "dissuade[] a reasonable worker from making or supporting a charge of discrimination" to be actionable. *Burlington*, 548 U.S. at 68 (quotation omitted). While "trivial harms" will still not constitute adverse employment actions, Title VII's anti-retaliation provision does prohibit a wider range of employer conduct than Title VII's substantive antidiscrimination provision. *Id.*; *see also Crawford*, 529 F.3d at 973-74.

In this case, in response to Defendants' argument, Plaintiff asserts only that the threatened discipline for fraternization, his transfer to Grady and accompanying denial of overtime at the Jail, and his discharge were adverse actions in the context of his retaliation claims. [Doc. 65 at 14-15.] Because he has not even offered a suggestion that the other, lesser complained-of conduct—such as his temporary shift reassignments and unenforced vacation request denial—would have dissuaded a reasonable working from making a charge of discrimination,[46] the Court deems any retaliation claim based upon them abandoned. *Resol. Tr. Corp.*, 43 F.3d at 599; *Wilkerson*, 270 F.3d at 1322. Summary judgment should therefore

---

[46] Unlike his arguments in relation to his discrimination claims, in which he at least contended that all of his myriad employment issues were actionable, Plaintiff does not contend that anything other than fraternization, transfer to Grady, and discharge are actionable. [*Compare*, Doc. 65 at 8, *with id.* at 14-15.]

be granted to the extent his retaliation claim encompasses any conduct other than the threats about his fraternizing with inmates, his transfer, and his discharge.

Because Plaintiff's transfer to Grady and his discharge are sufficiently adverse to support a discrimination claim, they will also support a retaliation claim. The Court therefore turns to the remaining item in dispute:  the meeting in September 2018, in which Plaintiff was reprimanded for giving inmate orderlies deputy trays and threatened with the termination of his employment.   As highlighted above, the materiality threshold for retaliation claims is "decidedly more relaxed" than the standard for discrimination claims requiring "a *serious and material* change in the terms, conditions, or privileges of employment."  *Crawford,* 529 F.3d at 970-71, 973 (emphasis in original) (internal quotation marks omitted).  As a result, "it is for a jury to decide whether anything more than the most petty and trivial actions against an employee should be considered 'materially adverse' to h[er] and thus constitute adverse employment actions."  *Id.* at 973 n.13 (citing *Burlington*, 548 U.S. at 72).

Applying these principles to Plaintiff's meeting on August 30, 2018, in which he was reprimanded for giving deputy trays to orderlies, the undersigned concludes that Plaintiff has raised at least a triable issue of fact about whether it

65

was sufficiently adverse.  As Plaintiff explains it, a little over a month after he filed an internal complaint with the ODC, he was called into this meeting with three of his commanding officers—Sgt. Sanders, Lt. Mayo, and Capt. Arnold; informed that he would be receiving a written warning for giving inmate orderlies deputy trays, despite it being a common practice at the Jail; and warned or threatened that he was on the verge of being discharged.  (*See* DSMF ¶ 92, PSAMF ¶ 68, 69; Pl. Dep. 62-68; Cherry Dep.  146-48, 156-57, 163.)  Only after Plaintiff complained that it was unfair and that he was being singled out for having submitted his complaint to ODC did Capt. Arnold relent and withdraw the warning.  (Pl. Dep. 64.)  Although it is a close call, viewing the record in the light most favorable to Plaintiff, a reasonable fact finder could conclude that being threatened with discipline and termination by three supervisors based upon trumped-up charges soon after filing a charge of discrimination would dissuade a reasonable worker from making a complaint of discrimination.  Although more extreme, in that it involved potential physical threats, the Eleventh Circuit's opinion in *Monaghan v. Worldpay US, Inc.* is instructive, as it found a supervisor's statements threatening "both termination and physical harm" were adequate to support a claim of retaliation.  *See Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 863 (11th Cir. 2020); *see also Hawthorne v. City*

66

*of Prattville*, No. 2:19-CV-139-RAH, 2020 WL 5880135, at *19 (M.D. Ala. Oct. 2, 2020) (suggesting that "statements from a supervisor which threatened termination" would be actionable under Title VII's anti-retaliation provision). While other cases have decided that lesser threats were not material, *see, e.g., Williams-Evans v. Advance Auto Parts*, 843 F. App'x 144, 149 (11th Cir. 2021) (finding that statements by other employees and plaintiff's manager saying she would be fired if she did not attend work were insufficient, where no one made any additional derogatory or offensive comments), Plaintiff's testimony, if credited, tends to show the threatened discipline and termination came from multiple supervisors, based upon pretextual reasons, soon after Plaintiff filed his ODC complaint.  In this context, a reasonable worker might have been dissuaded from opposing discrimination.[47]

---

[47] Were this not enough, the Eleventh Circuit has also recognized that "adverse actions which fall short of ultimate employment decisions" are still cognizable under Title VII's anti-retaliation provision because such conduct "could stifle employees' willingness to file charges of discrimination." *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998).  As a result, courts in this Circuit have regularly allowed retaliation claims to proceed based upon "actions that might not be sufficient individually" but are when "considered together." *See Taylor v. Cardiovascular Specialists, P.C.*, 4 F. Supp. 3d 1374, 1382 (N.D. Ga. 2014) (collecting cases); *see also Putman v. Sec'y of Veterans Affs.*, 510 F. App'x 827, 831-32 (11th Cir. 2013) ("In the context of a retaliation claim . . . the cumulative weight of numerous individual incidents can be considered in

Accordingly, Plaintiff has adequately supported that the August 30, 2018 meeting should be included as an actionable part of his retaliation claim, along with his transfer and discharge.

### 3.    Causation

The undersigned now turns to Defendants' argument that Plaintiff has failed to demonstrate that his protected activity is causally related to these putative acts of retaliation because none of the relevant decisionmakers were aware of Plaintiff's complaints of discrimination at the time of their actions. [Doc. 56-1 at 21-22.] It is true that, generally speaking, "[t]o establish a causal connection, a plaintiff must show that the relevant decisionmaker was 'aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated.'" *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1211 (11th Cir. 2013) (quoting *Shannon v. Bellsouth Telecomm., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002)). In this case, Defendants argue that: "there is no evidence that that Lt. Mayo was aware that

---

determining whether the employee experienced materially adverse action."). Viewed in this context, Plaintiff's "sudden reprimands for actions that allegedly never happened or that others commonly committed but for which they were not chastised, the increased scrutiny," may be considered together with his transfer to the Jail and his discharge, and "could—when taken together—dissuade a reasonable employee from making or supporting a charge of sexual harassment." *Taylor*, 4 F. Supp. 3d at 1382.

Plaintiff had participated in protected activity at the time she counseled Plaintiff for giving deputy trays to orderlies"; there is no evidence "that the relevant decisionmaker was aware that he had participated in protected activity when he was transferred to Grady"; and "Capt. Taylor was unaware that Plaintiff had complained of sex discrimination" when he recommended that Plaintiff's employment be terminated.  [Doc. 56-1 at 21-22.]

With regard to the September 2018 meeting, Plaintiff appears to concede that Lt. Mayo was the appropriate decisionmaker, but argues that his own testimony establishes the requisite awareness by Lt. Mayo.  [Doc. 65 at 15-16.]  Turning to that testimony, Plaintiff was asked if, "prior to being accused of fraternization on August 30th, 2018 by Lieutenant Mayo, do you know if Lieutenant Mayo was aware of your complaints?" to which he answered, "I don't know if she was aware of it, but – well, she should have been aware" simply because she was a lieutenant. (Pl. Dep. 69.)  But these types of "[c]onclusory, uncorroborated allegations by a plaintiff in . . . [a] deposition will not create an issue of fact for trial sufficient to defeat a well supported summary judgment motion." *Solliday v. Fed. Officers*, 413 F. App'x 206, 207 (11th Cir. 2011) (citing *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)).  And because Plaintiff has offered no other non-

69

speculative evidence in support, he fails to establish that Lt. Mayo had any awareness that he engaged in protected activity, and any causal connection is broken. *Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1054 (11th Cir. 2020) (noting that testimony that decisionmaker **could** have had knowledge of protected activity is not sufficient, standing alone). All indications are that Lt. Mayo recently joined the fourth floor as Plaintiff's supervisor, and that she believed she was appropriately applying the Jail's policy against serving inmate deputy trays. Summary judgment should therefore granted with regard to Plaintiff's claim that he was retaliated against when he was threatened at the August 30, 2018 meeting.

Plaintiff's transfer to Grady is a murkier situation. According to Lt. Cherry, only someone high up in the Sheriff's Office can effectuate a transfer between facilities (as opposed to a temporary floor reassignment) (Cherry Dep. 194-99), and according to Lt. Richardson, Plaintiff's transfer came about when Capt. Arnold told his lieutenants at a group meeting that "the powers that be need a few names to go to Grady," and the lieutenants responded verbally with some recommended names of detention officers (Richardson Dep. 129-32). Scouring the briefs and record, the Court is unable to determine conclusively who actually recommended that Plaintiff should be transferred. Given the foregoing evidence, however, a reasonable

70

factfinder could conclude that Capt. Arnold—who solicited the names in the first place—was the final decisionmaker.  Capt. Arnold's knowledge of Plaintiff's complaint, meanwhile, is undisputed (as is Lt. Cherry's and Lt. Richardson's, who were also present), and thus Defendants' causation argument is unavailing in relation to Plaintiff's transfer.  It coming closely on the heels of his EEOC charge of discrimination, meanwhile, establishes the requisite causal connection.  *See Cooper Lighting, Inc.*, 506 F.3d at 1364; *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004).  Accordingly, summary judgment should not be granted on this basis.

Finally, in relation to his discharge, while Plaintiff appears to concede Capt. Taylor's lack of knowledge, he nevertheless invokes the "cat's paw" theory to argue that the decision to recommend his discharge "was based on information [Capt. Taylor] received from Lee and Cherry" without any "meaningful independent inquiry"; and thus, a retaliatory motive may be imputed to Capt. Taylor.  [Doc. 56 at 16-17 (citations omitted).]  Under that theory, if a decisionmaker followed an improperly biased—that is retaliatory—recommendation without independently investigating, then the recommender's discriminatory animus may be imputed to the decisionmaker.  *Stimpson v. City of*

*Tuscaloosa*, 186 F.3d 1328, 1331-32 (11th Cir. 1999).  In other words, when a decisionmaker is "essentially acting as a rubber stamp of the biased recommendation," that decisionmaker's own awareness and motivations are irrelevant.  *Duncan v. Alabama*, 734 F. App'x 637, 639 (11th Cir. 2018).  If, however, the decisionmaker undertakes "an effort to independently investigate before making an adverse employment decision, [the decisionmaker] should not be held liable for another employee's hidden [retaliatory] motives." *Id.* (citing *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249-50 (11th Cir. 1998).

The Court certainly agrees that under certain circumstances, a causal connection may exist in the absence of direct decisionmaker knowledge when the termination decision is "tainted" by the retaliatory animus of a subordinate employee, *see Pennington v. City of Huntsville*, 261 F.3d 1262, 1270 n. 5 (11th Cir. 2001), but this is not such a case.  Here, Capt. Taylor's undisputed testimony is that after she was moved to Grady in February or March 2019, she decided on her own to review the attendance history for the employees under her supervision.  (*See* DSMF ¶¶ 79-80; PSAMF ¶¶ 105-06; Taylor Dep. 27-34.)  It also appears undisputed that in doing so, she did not have any knowledge about Plaintiff's complaints; and did not speak with Plaintiff, engage Human Resources broadly, or

review specific documentation about Plaintiff's absences.  (DSMF ¶ 90; PSAMF ¶¶ 107-110; Taylor Dep. 62, 68, 76.)  Capt. Taylor testified that she noticed, looking at attendance cards, that Plaintiff was late to work an excessive amount and that Plaintiff had what she believed to be at least ten unexcused absences (Taylor Dep. 27, 33, 62, 70-73; *see also* DSMF ¶ 81; R-DSMF ¶ 81), which was particularly troubling for Plaintiff as a probationary employee (DSMF ¶¶ 85-86; R-DSMF ¶ 85; Taylor Dep. 41-43, 64-65, 73-75).  In this regard, Capt. Taylor's actions do not implicate a cat's paw theory.

Plaintiff, though, contends that the following testimony establishes that Capt. Taylor was a mere cat's paw:[48]

- Capt. Taylor often spoke with Lieutenants about employees under her supervision, but also testified that she did "not recall talking about [Plaintiff]" with anyone when she started at Grady (Taylor Dep. 61);

---

[48] Plaintiff cites portions of Capt. Taylor's deposition to argue by assertion that "Taylor's recommendation to terminate Plaintiff was based on information she received from Lee and Cherry and she performed no meaningful independent inquiry."  [Doc. 65 at 17.]  As with many of his arguments, however, Plaintiff does not describe what the cited testimony actually shows, much less explain how it demonstrates that Capt. Taylor's termination decision was improperly influenced by Sgt. Lee or Lt. Cherry.

- After Capt. Taylor saw the volume of absences Plaintiff had accrued—23 tardies and 62 absences—she believed she "probably" asked Lt. Cherry or Sgt. Lee whether they "were excused," but found out that over ten were not (*id.* at 62, 68);

- Lt. Cherry and Sgt. Lee did not go into "any sort of detail" about the absences and tardies, but simply confirmed that between 10 and 20 of the incidents were unexcused (*id.* at 68-70);

- Capt. Taylor likely also spoke with Capt. Arnold about Plaintiff, but could not recall one way or another (*id.* at 76-77).

[See Doc. 65 at 17.]

But this is not sufficient to support a cat's paw theory. In the first instance, Capt. Taylor clarified that she spoke to "whoever had [Plaintiff's] file," and that that individual "told me which [of Plaintiff's absences and tardies] were excused," so she was "aware that [Plaintiff] had documentation for some of the absences." (Taylor. Dep. 62-63.) Capt. Taylor did not solicit a recommendation as to whether Plaintiff should be discharged or even whether the absences were grounds for termination. Further, Plaintiff has offered absolutely no evidence that any of the information that Lt. Cherry or Sgt. Lee shared with Capt. Taylor from Plaintiff's

74

file was inaccurate, much less that he had not accumulated at least 10 unexcused absences or tardies.   Indeed, looking solely at Plaintiff's 16 tardies between December 2018 and March 2019, the only excuses that Plaintiff offered for his tardiness were parking, traffic, and weather; and it beggars belief that he could excuse his repeated poor planning by reference to circumstances he was well aware of and/or that every commuter faces every day.[49]   Moreover, Plaintiff himself admits that he was absent 12 times between January and March 2019, and fails to provide any evidence that those absences were excused either.   (*See* DSMF ¶ 71; R-DSMF ¶ 71).   When a decisionmaker solicits accurate information from a subordinate and then makes an independent decision based upon that accurate information alone (and not any recommendation from the subordinate), the cat's paw theory does not apply.  *See Price v. Lafarge N. Am., Inc.*, No. CV-05-CO-00435-S, 2006 WL 8436738, at *9 n.10 (N.D. Ala. June 28, 2006) ("This is not a 'cat's paw' or 'rubber stamp' case; Mr. Buchanan's decision to terminate Ms. Price 'was not simply a tacit approval of [his subordinate's] decision to do the same.'") (citing *Llampallas*, 163 F.3d at 1249), *aff'd*, 212 F. App'x 887 (11th Cir. 2006); *see*

---

[49] Additionally, the majority of those tardies occurred after Plaintiff admitted he was specifically warned he could not rely on any grace period to excuse his absences.

*also Lindsey v. Walgreen Co.*, 615 F.3d 873, 876 (7th Cir. 2010) (affirming summary judgment where supposed cat's paw manipulator did not conceal evidence from or present falsehoods to decisionmaker); *Dickinson v. Edward D. Jones & Co., L.P.*, No. 4:14-CV-00397-REB, 2016 WL 4500777, at *3 (D. Idaho Aug. 26, 2016) ("[T]his is not a situation in which the alleged discriminator gave a biased account to the decisionmaker which led to an adverse employment action, but rather a situation where the account was accurate and was expressly confirmed."); *Ameen v. Amphenol Printed Cirs., Inc.*, No. 12-CV-365-LM, 2013 WL 6834648, at *8 (D.N.H. Dec. 23, 2013) (same), *aff'd*, 777 F.3d 63 (1st Cir. 2015).

Additionally, Plaintiff also has not done anything to explain how his evidence shows that Lt. Cherry or Sgt. Sanders harbored a retaliatory bias or how any such bias might have improperly influenced their decision to share an accounting of Plaintiff's excuses for absences and tardies. *Polion v. City of Greensboro*, 614 F. App'x 396, 399 (11th Cir. 2015) (holding that a plaintiff must show that a "biased recommendation" was followed and finding summary judgment appropriate when plaintiff failed to "present evidence that [the subordinate]'s recommendation was biased."). Because Plaintiff fails to offer more

than Lt. Cherry and Sgt. Sanders's mere awareness of his protected activity,[50] the Court cannot agree that the cat's paw theory applies to save Plaintiff's prima facie case of retaliatory discharge.

And because it is undisputed that Capt. Taylor was unaware of Plaintiff's protected activity when she decided to recommend the termination of his employment, there can be no causal connection between the two, and summary judgment should be granted on Plaintiff's claim for retaliatory discharge.[51]

### 4.    Legitimate Non-Retaliatory Reason and Pretext

Because Plaintiff can establish a prima facie case of retaliation with regard to his transfer, the burden shifts to Defendants to articulate a legitimate,

---

[50] As discussed in great detail in Section II.B.2.a. above, relating to Plaintiff's mixed-motive and pretext arguments, the evidence Plaintiff has cited elsewhere in his brief to impugn Lt. Cherry and Sgt. Sanders's possible motivations are (1) that they failed to meaningfully address his complaint initially, which does not appear to be the case, and (2) that they did not approve two of his leave requests, which in truth happened either because they were either unaware the leave had been approved or because Plaintiff had insufficient vacation time.  Plaintiff does not cite any evidence to call these conclusions into question, much less raise the inference that either Lt. Cherry or Sgt. Mayo, nearly half a year later, fabricated unexcused absences or tardies in order to have Plaintiff fired.

[51] The undersigned notes that the foregoing analysis would apply to dispel any inference of pretext if Plaintiff had offered any additional argument about pretext in relation to his discharge; however, rather than set forth an independent pretext argument, he merely references his laundry list of items previously offered in relation to his discrimination claims.  [See Doc. 65 at 17.]

nondiscriminatory reason for its decision. *McCann v. Tillman*, 526 F.3d 1370, 1375 (11th Cir. 2008). This burden is one of production, not persuasion, and is "exceedingly light." *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994); *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1141 (11th Cir. 1983). After that, the burden shifts back to Plaintiff. *Berber v. Wells Fargo, NA*, 798 F. App'x 476, 478 (11th Cir. 2020).

Plaintiff argues that a reasonable jury could conclude that the reason provided by Defendants for his transfer to Grady—staffing needs—was merely pretextual, and while it is close, the Court agrees. As mentioned above, to demonstrate pretext, a plaintiff must show enough "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs*, 106 F.3d at 1538. In doing so, a plaintiff can rely on a wide variety of circumstantial evidence to prove that the employer's proffered reason was pretextual, and that the real reason was retaliatory in nature. *See Lockheed-Martin*, 644 F.3d at 1328-29. Indeed, the same circumstantial evidence supporting a prima facie case may be used in the pretext analysis. For example, temporal proximity is evidence of pretext, even if it does not establish pretext in

78

isolation. *Jackson v. Hennessy Auto*, 190 F. App'x 765, 768 (11th Cir. 2006); *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006) (finding a period of "no more than two weeks" as evidence of pretext). Finally, provided that there is sufficient evidence discrediting the employer's proffered reasons, the evidence supporting the prima facie case may be sufficient to survive summary judgment. *Williams v. Vitro Servs. Corp.*, 144 F.3d 1438, 1446 (11th Cir. 1998) (citing *Tidwell v. Carter Prods.*, 135 F.3d 1422, 1426 (11th Cir. 1998)).

In this case, there are a number of problems with Defendants' stated reason for Plaintiff's discharge, but the primary one is this: while Defendants have offered that Plaintiff and other officers were transferred because of staffing needs, they have not explained who recommended that Plaintiff be one of the detention officers transferred, have not offered any testimony even identifying the lieutenant or other supervisor who recommended that Plaintiff be among those transferred, or explained why that supervisor selected Plaintiff from the larger pool of officers for transfer. In this respect, while Defendants have offered a general rationale for transferring some detention officers to Grady, they have not provided any reason whatsoever for why Plaintiff himself was transferred. *See Licausi v. Symantec Corp.*, No. 08-60544-CIV, 2009 WL 1873663, at *11-13 (S.D. Fla. June 30, 2009)

79

(holding that in the reduction-in-force context, pretext analysis must consider whether improper bias played a role in the decision to include the plaintiff within the impacted group, separate from the justification for the reduction-in-force), *aff'd*, 378 F. App'x 964 (11th Cir. 2010); *see also E.E.O.C. v. Fannin Cnty.*, No. 2:13-CV-225-RWS, 2015 WL 5725697, at *23 (N.D. Ga. Sept. 29, 2015) (evaluating reasons for including the plaintiff on a reduction-in-force list separate from the reasons for the reduction-in-force); *Guzzo v. Queen of Angels Sch.*, No. CIV.A. 05-933, 2007 WL 712122, at *3 (W.D. Pa. Mar. 7, 2007) ("This argument goes little further than 'the RIF made us do it' theory rejected above, as no explanation has been provided."). As a result, Defendants have not carried their burden of asserting a legitimate nondiscriminatory reason for selecting Plaintiff for transfer to Grady.

But even if they had made such a showing, the conclusory nature of Defendants' stated reason and their lack of any objective criteria for selecting officers to transfer makes it less worthy of credence. *See Lowery v. Roberts*, No. 5:08CV289/RS/EMT, 2009 WL 1456419, at *4 (N.D. Fla. May 22, 2009) (citing *Hicks*, 509 U.S. at 511). Further, this lack of criteria and any explanation pertaining to Plaintiff's transfer, along with the close temporal proximity of the transfer decision to his complaints of discrimination, his complaint to the ODC, and his

filing of a charge of discrimination with the EEOC, leaves the undersigned to conclude that a reasonable jury could find it more likely than not that Plaintiff was retaliated against when he was transferred away from the Jail. *Guzzo*, 2007 WL 712122, at *3. In other words, a reasonable factfinder could conclude that the Defendants' stated reason was a pretext for retaliation. Accordingly, summary judgment should be **DENIED** with respect to his retaliatory transfer claim.

## IV.    CONCLUSION

For the foregoing reasons, it **RECOMMENDED** that the motion for summary judgment be **GRANTED IN PART AND DENIED IN PART.** [Doc. 56.] More specifically, summary judgment should be **GRANTED** to Defendants with respect to Plaintiff's Title VII and EPC discrimination claims, as well as his retaliation claim to the extent it is based upon conduct predating his transfer to Grady hospital and conduct pertaining to his discharge; it should, however, be **DENIED** with respect to his claim that Defendant Jackson, in his official capacity, transferred Plaintiff to Grady in retaliation for engaging in activity protected by Title VII.

The Clerk is **DIRECTED** to terminate reference to the undersigned.

IT IS SO RECOMMENDED this 18th day of July, 2022.

_____
JOHN K. LARKINS III
United States Magistrate Judge