**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

DeMarcus Harris,

                   Plaintiff,

                              Case No. 1:19-cv-5849-MLB

v.

Sheriff Theodore Jackson, et al.,

                   Defendants.

_____/

## **OPINION & ORDER**

This is an employment discrimination and retaliation case. Plaintiff alleges Defendant Theodore Jackson, acting in his official capacity as former Fulton County Sheriff, discriminated against him based on his sexual orientation and retaliated against him for engaging in protected activity.[1]   (Dkt. 14.)   For similar reasons, he claims

---

[1] Jackson is no longer the Sheriff of Fulton County.  (Dkt. 56-2 ¶ 4.) Plaintiff has not amended the Complaint to name Fulton County's current Sheriff as a Defendant.

Defendants Jackson, Antonio Richardson,[2] Temeka Cherry, and Tyna Taylor—acting in their official and individual capacities—violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution ("EPC").  (*Id.*)  Defendants moved for summary judgment.  (Dkt. 56.)

Magistrate Judge Larkins issued a Report and Recommendation ("R&R") saying this Court should grant in part and deny in part Defendants' motion.  (Dkt. 67.)  Both parties filed objections.  (Dkts. 74, 73.)  The Court overrules all but one of Plaintiff's objections and adopts the R&R as modified herein.

## I.   Background[3]

---

[2] It appears Plaintiff misnamed Richardson as "Anthony" in the Amended Complaint.  (*See* Dkt. 73 at 1 n.2.)  Plaintiff has not yet amended the complaint to correct the misnomer.

[3] The Court bases its recitation of the facts on the parties' statements of material facts and their respective responses required by Local Rule 56.1(B)(1)–(3).  (*See* Dkts. 65-1, 66-1.)  That Rule says that in responding to a movant's statement of material fact, the non-movant shall provide "nonargumentative responses" to each numbered fact set out in the statement.  L.R. 56.1(B)(2)(a)(1).  The court then deems admitted "each of the movant's facts . . . unless the respondent . . . directly refutes the movant's fact with concise responses supported by specific citations to evidence," "states a valid objection to the admissibility of the movant's fact," or "points out that the movant's citation does not support the movant's fact or that the movant's fact is not material or otherwise has

## A.    Alleged Homophobic Comment by Plaintiff's Coworker and Ensuing Investigation

Plaintiff—a gay man—worked as a detention officer for the Fulton County Sheriff's Office from March 2018 until April 2019.  (Dkt. 65-1 ¶ 5.) Plaintiff's husband also worked for the Sheriff's Office.  (*Id.*)  Plaintiff

---

failed to comply with the provisions set out in LR 56.1(B)(1)."  L.R. 56.1(B)(2)(a)(2).  The Court notes that several of Plaintiff's responses to Defendants' Statement of Material Facts contain precisely the kind of argumentative answers and legal conclusions that Rule 56.1(B) proscribes.  For example, Plaintiff often concedes that a fact of Defendants' is not in dispute but argues about Defendants' motivation or intent.  (*See, e.g.*, Dkt. 65-1 ¶¶ 12, 14, 28, 41, 55, 62–63, 65, 71, 75–78, 83–85, 90, 98–99.)  Legal argument is not appropriate for a response to a statement of material fact.  *See Belgrave v. Publix Supermarket, Inc.*, 2022 WL 3048328, at *2 (N.D. Ga. July 14, 2022) (excluding from Rule 56.1(B) statements of fact "any assertions of fact by either party that are . . . presented as arguments or legal conclusions").

Similarly, Rule 56.1(B)(3) provides that when a movant responds to a statement of additional material facts, "the range of acceptable responses is limited to," among other things, "an objection on the ground that the respondent's fact is not material or does not otherwise comply with the provisions set out in LR 56.1(B)(1)."  In responding to Plaintiff's Statement of Additional Material Facts, Defendants repeatedly object—without explaining why—to various facts on the ground that the facts do not comply with Rule 56.1(B)(1).  (*See, e.g.*, Dkt. 66-1 ¶¶ 9, 11–14, 17, 21–22, 25–27, 38, 41, 46, 50–51, 53–58, 60, 63–64, 67, 70–76, 81–82, 86–87, 90, 95–97, 99–100, 102, 104, 110–112.)  Asserting such boilerplate objections does nothing to help the Court ferret out the material facts.

and his husband were open about their sexual orientation, and Plaintiff has not identified anyone in the office who did not know he is gay.

Plaintiff initially worked on the fourth floor of the Fulton County Jail and reported to Defendant Cherry—a lieutenant.  (Dkts. 65-1 ¶ 8; 66-1 ¶¶ 4–5.)  At some point, a jail nurse told Plaintiff's husband a fellow officer—Levan Wilson—said he did not like working with Plaintiff's "gay ass."  (Dkts. 65-1 ¶¶ 23–24; 66-1 ¶¶ 6–7.)  Plaintiff's husband told Plaintiff about the remark, and Plaintiff told Lt. Cherry.  (Dkt. 66-1 ¶¶ 6–7.)  Lt. Cherry suggested Plaintiff speak with Wilson.  (*Id.* ¶ 8.)  When Plaintiff did that, Wilson denied making the comment.  (Dkts. 65-1 ¶ 26; 59 at 15:3–16:19.)  Plaintiff admits Wilson never made any inappropriate comments directly to him.  (*Id.*)  Plaintiff sensed some "tension" with Wilson around that time but continued working with him on the fourth floor.  (Dkts. 59 at 16:20–18:24; 66-1 ¶ 10.)

Lt. Cherry asked Wilson if he had said "anything derogatory or negative to a civilian in reference to [his] coworker."  (Dkt. 60 at 63:6-9.)  Wilson responded that he did not know what Lt. Cherry was talking about.  (*Id.*)  Lt. Cherry did not identify Plaintiff, the nurse, or the alleged comment as she was just following up on "rumors" or "gossip."  (*Id.* at

4

62:6–63:4.)  Lt. Cherry warned Wilson that she was not going to tolerate derogatory comments between coworkers.  (*Id.* at 65:7–66:19.)  She also sent an email to everyone working on the fourth floor saying she had learned people were not getting along with each other but she would not tolerate "gossip and rumors."  (*Id.*)

About a week later, Angela Sanders became a sergeant on the fourth floor.  (Dkt. 66-1 ¶ 15.)  Plaintiff told Sgt. Sanders he felt discriminated against as a result of Wilson's comment.  (*Id.* ¶ 16.)  Sgt. Sanders told Plaintiff she would speak with Defendant Richardson—the lieutenant who supervised the entire fourth floor—about the situation.  (*Id.* ¶ 18–19.)  Sgt. Sanders later told Plaintiff about a planned meeting between her, Plaintiff, Lt. Richardson, and Wilson.  (*Id.* ¶ 20.)

At that meeting, Plaintiff said he believed Wilson did not like working with him because Plaintiff is gay.  (Dkt. 65-1 ¶¶ 31–33.)  This was the first time Lt. Richardson learned Wilson had supposedly made the homophobic comment.  (*Id.*)  Lt. Richardson spoke with Wilson privately.  Wilson said he did not like working with Plaintiff because Plaintiff had accused him of making the homophobic comment.  (Dkt. 57 at 37:11–38:18, Ex. 9.)  Lt. Richardson testified he trusted both Plaintiff

5

and Wilson but planned to approach the issue with a "trust but verify" mentality.  (Dkt. 57 at 40:22–42:12.)

Lt. Richardson shared Plaintiff's complaint with three other lieutenants—including Lt. Cherry—and then spoke with his captain. (Dkts. 65-1 ¶ 35; 66-1 ¶¶ 28–29.)  The captain ordered Lt. Richardson to investigate the allegation.  (*Id.*)  During that investigation, the nurse told Lt. Richardson that Wilson had said he did not like working with Plaintiff's "gay ass."  (Dkts. 65-1 ¶ 37; 66-1 ¶ 34.)  But the nurse would not provide a written statement.  (*Id.*)   Lt. Richardson subsequently provided a written report outlining his conclusions and making several recommendations.  (Dkts. 65-1 ¶ 38; 57 Ex. 9; 66-1 ¶ 32.)  As part of this, he recommended that Wilson "receive a counseling session on gossiping" to ensure he made no similar comments in the future and understood he would be disciplined if he did.  (Dkts. 57 at 63:7–64:1; 57 at Ex. 9; 65-1 ¶ 40.)   Lt. Richardson also recommended Plaintiff be transferred to another floor because he was not getting along with his coworkers and did not feel safe working on the shift.  (Dkts. 65-1 ¶ 41; 66-1 ¶ 35; *see also* Dkt. 57 at Ex. 9 (describing reason for Plaintiff's relocation as

"dysfunctionality of the floor resulting in an unsafe work environment for him").)

## B.   Plaintiff's Reassignment and Threatened Discipline

In early August 2018, Captain Maurice Arnold transferred Plaintiff and several other employees to different floors.  (Dkts. 65-1 ¶¶ 45, 48; 66-1 ¶¶ 43, 47.)  Plaintiff was reassigned to the third floor with new days off but the same working hours.  (*Id.*)  Plaintiff discussed the transfer with Lt. Richardson, who told him it had been done for his "safety."  (Dkts. 66-1 ¶¶ 44, 49.)  Plaintiff told Lt. Richardson the transfer adversely impacted his life (including because the new schedule interfered with his child custody arrangements).  (Dkt. 66-1 ¶¶ 50–51).  He also said it was unfair to move him since he had done nothing wrong.  (Dkts. 59 at 33:7–34:5; 66-1 ¶ 51.)  The day before his move to the third floor became effective—specifically, on August 7, 2018—Plaintiff filed an internal discrimination complaint.  (Dkt. 65-1 ¶ 54.)

Plaintiff also spoke to Capt. Arnold about his dissatisfaction with the move, and Capt. Arnold purportedly apologized for the situation.  (Dkts. 59 at 36:4–21; 65-1 ¶ 56; 66-1 ¶ 52.)  Based on that discussion, the Sheriff's Office returned Plaintiff to his prior assignment.  (Dkt. 65-1

¶ 56.)   In addition, Capt. Arnold changed the reporting structure so Plaintiff no longer reported to Lt. Richardson and moved Wilson to a different area of the jail so Plaintiff no longer worked directly with him. (Dkts. 57 at 96:9–20; 58 at 63:3–64:10; 60 at 141:6–18, 146:24–147:24.)

Soon after Plaintiff's return to the fourth floor, Lieutenant Kristi Mayo became his direct supervisor.   (Dkts. 60 at 147:21–148:5.) According to Plaintiff, Lt. Mayo started to monitor "[e]verything [he] was doing on the floor," and "would always come on [the] floor when [Plaintiff was] working . . . and just question [Plaintiff] about things." (Dkt. 59 at 62:14–23.)  Not long after, Lt. Mayo called Plaintiff into a meeting with Lt. Mayo, Sgt. Sanders, and Capt. Arnold. (Dkts. 65-1 ¶¶ 91–92; 66-1 ¶ 68.)  She told Plaintiff she was writing him up for fraternizing with inmates by giving inmates classified as "orderlies" trays of food that were intended for deputies.  (*Id.* at ¶ 69.)  She and Capt. Arnold also said Plaintiff was on the verge of being fired.  (*Id.* ¶ 71.)  The Sheriff's Office had a policy that only allowed inmates classified as "trustees" to receive deputy trays.  (Dkt. 65-1 ¶ 93.)  According to Plaintiff, however, it was common practice for orderlies who helped officers serve inmates to also receive deputy trays.  (Dkts. 65-1 ¶ 95; 66-1 ¶ 70.)

Plaintiff complained at the meeting that giving orderlies deputy trays did not constitute fraternization and claimed he was being unfairly targeted for submitting his internal discrimination complaint. (Dkt. 59 at 62:14–64:14.) After a private conversation between Sgt. Sanders and Capt. Arnold, Sgt. Sanders told Plaintiff she was throwing out the write-up for fraternization. (*Id.* at 64:15–23.) On the day of the meeting— August 30, 2018—Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Doc. 65-3 ¶ 3.)

## C.   Plaintiff's Transfer to Grady Hospital

In October 2018, the Sheriff's Office needed more officers to work at Grady Hospital. (Dkts. 56-4 ¶ 5; 60 at 210:22–24.) Capt. Arnold asked several lieutenants to identify officers he could send to the hospital. (Dkt. 66-1 ¶ 80.) The lieutenants "threw some names at" Capt. Arnold. (*Id.*) While Plaintiff was identified as one such officer, no record evidence conclusively shows who identified him. (Dkts. 57 at 129:6–130:3; 58 at 91:22–92:21; 60 at 194:18–195:10.) Regardless, Plaintiff began working

9

at Grady on October 17, 2018—about a month and a half after he filed his EEOC charge.[4]  (Dkt. 56-4 ¶ 3.)

Between October 22 and December 20, 2018, Plaintiff was out of work for personal reasons.[5]  (Dkts. 65-1 ¶¶ 59–60; 66-1 ¶ 78.)  Upon his return, Plaintiff worked at the hospital.  (Dkts. 65-1 ¶ 61; 66-1 ¶ 79.)  Lt. Cherry and two other detention officers were also sent to the hospital without additional explanation.  (Dkt. 56-4 ¶¶ 4–5; 60 at 199:9–22.)

According to Plaintiff, when he worked at Grady, the Sheriff's Office had a mandatory overtime requirement that forced officers to work extra hours at the jail.  (Dkt. 59 at 51:4–15.)  Apparently, some officers, like Plaintiff, welcomed this requirement.  Plaintiff asserts that he asked Lt.

---

[4] It is not clear exactly when Capt. Arnold asked for names or when the Sheriff's Office ultimately decided to transfer Plaintiff.  The earliest date the Court can glean from the record is October 17, 2018, which is the day Sgt. Lee testified she began supervising Plaintiff at Grady.  (Dkt. 56-4 ¶ 3.)  It is clear, however, that the Sheriff's Office decided to transfer Plaintiff sometime prior to or during mid-October—months before he actually began working at Grady because of his injury but shortly after he lodged his discrimination complaint.

[5] Sgt. Lee testified that Plaintiff was out of work starting on October 29, (Dkt. 56-4 ¶ 6), but Defendants point to Plaintiff's deposition and his doctor's note in asserting that Plaintiff was out as of October 22—a fact Plaintiff does not dispute, (Dkts. 65-1 ¶ 60.)

Cherry to allow him to work overtime at the jail, but he was never given that opportunity.  (*Id.*; *see also* Dkts. 65-1 ¶ 69; 56-4 ¶ 23.)  He worked several overtime shifts at Grady but not at the jail.  (Dkts. 56-4 at 12–13, Ex. A.)  When he asked his new supervisor at Grady—Sergeant Yolanda Lee—if she had heard from Lt. Cherry about his overtime request, Sgt. Lee responded that Lt. Cherry had Plaintiff on "stand by."  (Dkt. 66-1 ¶¶ 88–89.)  In any event, Plaintiff was never approved to work overtime at the jail despite his contention that others were allowed to do so.  (Dkts. 59 at 53:10–13; 66-1 ¶ 89.)

## D.   Plaintiff's Absenteeism and Ultimate Discharge

Employees are in violation the Sheriff's Office's attendance policy if they are late three or more times in a 90-day period.  (Dkt. 65-1 ¶ 14.)  In December 2018, Plaintiff was late to work five times.  (Dkts. 56-4 ¶ 13; 59 at 72:11–73:5.)  Sgt. Lee thus issued Plaintiff a verbal warning.  (Dkts. 59 Ex. 8; 65-1 ¶ 72; 66-1 ¶ 93.)  While Sgt. Lee testified she did not know about Plaintiff's complaint against Wilson when she issued the warning, Plaintiff claims she did because they discussed the complaint when he began working at Grady.  (Dkts. 56-4 ¶ 10; 59 at 49:23–50:9.)

11

Plaintiff was late for work four times in January 2019 and five times in February 2019. (Dkts. 56-2 ¶ 76; 59 at 80:16–81:1, Ex. 10; 65-1 ¶ 72; 66-1 ¶¶ 101, 103.) Sgt. Lee issued another written warning and a corrective action plan for attendance issues. (Dkt. 66-1 ¶ 103.) Plaintiff wrote a rebuttal, asserting "I have been on time and present with great attendance," and "my attended card for the year shows nothing but me being in the guidelines of the Fulton County Policy and Procedures." (Dkt. 59 at 91:23–92:2, Ex. 12.) Plaintiff admits, however, that the Sheriff's Office records accurately reflect when he was late and when he was absent. (*Id.* at 72:11–73:9, 80:22–81:1, 100:10–20.) He presents no evidence the absences were excused. Plaintiff was late twice in March 2019 and absent five other days that month. (Dkt. 56-4 ¶ 17; *see also* Dkts. 56-2 ¶ 83; 65-1 ¶ 83.)

Around February or March of that year, Defendant Taylor—a captain—was transferred to Grady to supervise the detention officers. (Dkts. 56-2 ¶ 79; 65-2 ¶ 105.) Capt. Taylor reviewed the attendance history of the officers under her supervision (including Plaintiff) by looking at their attendance cards and the Sheriff's electronic timekeeping system. (Dkt. 61 at 27:11–30:4, 32:16–34:9; *see also* Dkts. 56-2 ¶ 80; 65-

1 ¶ 80; 65-2 ¶ 106.)  Capt. Taylor testified Plaintiff had been out sick 62 times and tardy 23 times during the prior one-year period.  (Dkt. 61 at 67:13–68:2.)  Capt. Taylor determined at least 10 to 15 (and maybe as many as 20) of those absences were not excused.  (*Id.* at 69:18–73:24; *see also* Dkts. 56-2 ¶ 81; 65-1 ¶ 81.)

It is not exactly clear how Capt. Taylor reached the conclusion Plaintiff had so many unexcused absences.  She testified that, in addition to looking at documentation, she spoke to "whoever had [Plaintiff's] file," and that individual told her which of Plaintiff's absences and tardies were excused.  (Dkt. 61 at 62:2–63:3.)  Capt. Taylor said that individual "probably" was *either* Lt. Cherry *or* Sgt. Lee but she could not say for sure.  (*Id.* at 62:16–18.)  Capt. Taylor also testified that documentary proof of excused absences is kept in employee files, and Plaintiff testified that he always brought in a doctor's note if he was out for such an appointment. (Dkts. 59 at 100:6–101:4; 61 at 37:2–40:25; 65-1 ¶¶ 81, 82.) Regardless of with whom she spoke and what she reviewed, Capt. Taylor testified unequivocally that she determined Plaintiff had at least 10 unexcused absences.  And Plaintiff cites no evidence to suggest Capt.

Taylor's conclusion was incorrect.  Put differently, he has identified no evidence from which a jury could reach that conclusion.

Plaintiff was still a probationary employee, which meant Capt. Taylor had to make a recommendation about his continued employment. (Dkts. 59 at 95:2–18; 61 at 41:9–43:17, 64:2–65:23, 73:11–75:11; *see also* Dkt. 65-1 ¶ 85.)  After reviewing Plaintiff's attendance records—along with her knowledge of his prior attendance warnings—Capt. Taylor concluded Plaintiff's attendance problems were unacceptable.  (Dkts. 62 at 41:9–43:17, 73:11–75:11, Ex. 19.)  She recommended he be fired.  (Dkt. 65-1 ¶ 86.)  At the time she made her recommendation, Capt. Taylor did not know about Plaintiff's discrimination complaint.  (Dkt. 65-1 ¶ 90.) Consistent with Capt. Taylor's recommendation, in early April 2019, Sheriff Jackson terminated Plaintiff for "excessive absenteeism and tardiness." (Dkt. 66-1 ¶ 117.)

### E.   Plaintiff's Lawsuit, Defendants' Summary Judgment Motion, and the Magistrate Judge's R&R

Plaintiff sued.  (Dkt. 1.)  He contends his treatment at the Sheriff's Office—culminating in his discharge—amounts to discrimination and retaliation in violation of Title VII, as well as discrimination in violation of the EPC actionable through 42 U.S.C. § 1983.  (Dkt. 14 ¶¶ 52–86.)

14

Plaintiff asserts his Title VII claim only against Sheriff Jackson in his official capacity, while he brings his remaining EPC claim against all Defendants in their official and individual capacities. (*Id.*) Defendants filed a motion for summary judgment, Plaintiff responded, and Defendants filed a reply. (*See* Dkts. 56; 65; 66.)

## II.   Legal Standards

### A.   Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if "it might affect the outcome of the suit under the governing law." *W. Grp. Nurseries, Inc. v. Ergas*, 167 F.3d 1354, 1360 (11th Cir. 1999). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 1361.

The party moving for summary judgment bears the initial burden of showing a court, by reference to materials in the record, that there is no genuine dispute as to any material fact. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). The nonmoving party then has

the burden of showing that summary judgment is improper by coming forward with "specific facts" showing a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Ultimately, there is no "genuine issue for trial" when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.* "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

Throughout its analysis, the court must "resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his or her favor." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). "It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

## B.    R&R

"[T]he court shall make a de novo determination of those portions of the [R&R] to which objection is made."   28 U.S.C. § 636(b)(1).  "Parties filing objections to a magistrate's report and recommendation must specifically identify those findings objected to.  Frivolous, conclusive, or general objections need not be considered by the district court."  *Marsden v. Moore*, 847 F.2d 1536, 1548 (11th Cir. 1988).  After conducting the required review, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

## III.  Discussion

## A.    Discrimination Claims

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of," among other things, "such individual's . . . sex[.]" 42 U.S.C. § 2000e-2(a)(1).  Similarly, "[t]he Equal Protection Clause of the Fourteenth Amendment prohibits . . . sex discrimination in public employment." *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1312 (11th Cir. 2018).  Where—like here—an EPC claim is

17

brought through 42 U.S.C. § 1983, such "claims are subject to the same legal analysis" as those brought under Title VII.[6]  *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016).  Under that analysis, for his discrimination claim to succeed, Plaintiff must show Defendants intentionally discriminated against him based on his sexual orientation using direct or circumstantial evidence.  *See Sirpal v. Univ. of Miami*, 509 F. App'x 924, 926 (11th Cir. 2013).

---

[6] The Supreme Court and the Eleventh Circuit have not addressed whether the EPC supports a claim of sexual orientation discrimination.  The parties, however, do not dispute as much.  And given that the Supreme Court has concluded that sexual orientation discrimination constitutes actionable sex discrimination under Title VII, the Court assumes Plaintiff's sexual orientation discrimination claim appropriately sounds in the EPC through § 1983.  *See Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1743 (2020).  Indeed, the Eleventh Circuit has held that "discrimination against a transgender individual because of her gender non-conformity is sex discrimination" in violation of the EPC "whether it's described as being on the basis of sex or gender."  *Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011).  The Court sees no material difference with regard to sexual orientation.  *See Bostock*, 140 S. Ct. at 1737 ("An employer who fires an individual for being homosexual or transgender fires that person for traits or actions it would not have questioned in members of a different sex."); *see also Izzard v. Cty. of Montgomery, Pa.*, 2021 WL 5639817, at *10 (E.D. Pa. Nov. 29, 2021) (concluding sexual orientation is quasi-suspect class deserving of heightened scrutiny under the EPC).

### 1. Plaintiff Fails to Establish a Prima Facie Case of Discrimination

Plaintiff offers no direct evidence of discrimination. Instead, he seeks to present a circumstantial case of discrimination under the burden-shifting framework set out in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). To take advantage of that rubric, Plaintiff is first required to establish a prime facie case of discrimination by presenting evidence that—among other things—"he was replaced by a person outside his protected class or was treated less favorably than a similarly situated individual outside his protected class." *See Howard v. Ore. Television, Inc.*, 276 F. App'x 940, 942 (11th Cir. 2008); *Maynard v. Bd. of Regents of Div. of Univ. of Fla. Dep't of Educ. ex rel. Univ. of S. Fla.*, 342 F.3d 1281, 1289 (11th Cir. 2003).[7] The Magistrate Judge concluded

---

[7] In total, a "plaintiff proceeding under *McDonnell Douglas* must prove, as a preliminary matter, not only that she is a member of a protected class, that she suffered an adverse employment action, and that she was qualified for the job in question, but also that she was treated less favorably than 'similarly situated' individuals outside her class." *See Lewis*, 918 F.3d at 1217. Should the plaintiff meet this burden, a defendant may avoid summary judgment by "articulat[ing] a legitimate, non-discriminatory reason for its action." *Cooper v. Jefferson Cty. Coroner & Med. Examiner Office*, 861 F. App'x 753, 757 (11th Cir. 2021). If the defendant does so, the plaintiff is given a final opportunity to avoid

Plaintiff failed to identify any comparator who was treated more favorably with respect to the only two sufficiently adverse actions identified by Plaintiff—his denial of overtime after the transfer to Grady and his termination.  (Dkt. 67 at 45–48.)  Plaintiff objects, claiming he provided sufficient comparator evidence to create a triable issue of fact by testifying that he saw other officers at Grady going to the jail for overtime work and that he knows other officers were not disciplined for similar attendance records.  (Dkt. 74 at 3–5.)

To satisfy the "similarly situated" requirement of the prima facie case, a plaintiff's proffered comparators must be "similarly situated in all material respects."  *Lewis v. City of Union Cty., Ga.*, 918 F.3d 1213, 1228 (11th Cir. 2019).  That is, the plaintiff and his comparators "must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'"  *Id.* (quoting *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 231 (2015)).  Whether an individual is similarly situated is highly case-specific.  "[A] similarly situated comparator will ordinarily (1) have engaged in the same basic conduct as the plaintiff; (2) have been subject

---

summary judgment by presenting evidence "that the defendant's reason was pretextual."  *Id.*

to the same employment policy, guideline, or rule as the plaintiff; (3) have been under the jurisdiction of the same supervisor as the plaintiff; (4) and share the plaintiff's employment history." *Earle v. Birmingham Bd. of Educ.*, 843 F. App'x 164, 166 (11th Cir. 2021) (citing *Lewis*, 919 F.3d at 1227–28.)  A "plaintiff's failure to produce evidence showing that a *single* similarly situated employee was treated more favorably will preclude the establishment of a prima facie case." *Id.* (emphasis added).

Plaintiff could not identify by name or description any other officer at Grady who was sent to the jail to perform overtime work.  (Dkt. 59 at 53:10–54:1.)  He simply said it happened.  As the Magistrate Judge observed, Plaintiff points to no evidence from which a jury could conclude any of these unidentified people were similarly situated to him in all material respects.  He did not, for example, explain "how their purportedly offending conduct was similar to his own," did not identify "supervisors or any relevant decisionmaker that they shared," and did not describe "their employment history in any shape or form."  (Dkt. 67 at 47.)  Plaintiff does not even assert that these other, unidentified

officers were not gay.[8]  Plaintiff's conclusory and speculative testimony does not come close to meeting his burden of showing he was treated less favorably than a similarly-situated individual outside his protected class.[9]

---

[8] In arguing otherwise, Plaintiff claims he testified that the unnamed comparable officers were on his shift, and thus "would have been under the same supervisor." (Dkt. 74 at 4.)  But Plaintiff misrepresents his testimony, in which he generally referred to other officers at Grady working overtime and then separately discussed the officers on his shift:

> Q: During this timeframe that you observed other detention officers being sent to the jail to work overtime?
>
> A: Yes.
>
> Q: How many detention officers, roughly speaking, worked at Grady?
>
> A: I would say probably about – we have three shifts.  So I would say on my shift there probably was about six of us.

(Dkt. 59 at 53:10–18.)  Plaintiff did not testify that the other officers on his shift were the ones working overtime at the jail.  And regardless, Plaintiff says nothing about whether these officers were gay.

[9] Plaintiff also argues that he offered more than just his own conclusory testimony in support of his prima facie case because—according to Sgt. Lee—Lt. Cherry had Plaintiff on "stand by" for overtime. (Dkt. 74 at 4.) Plaintiff misses the point.  Even if Lt. Cherry intentionally barred him from working overtime at the jail, he has not identified any other officer who was not gay and who *did* work overtime there.

Plaintiff also offers no evidence that a non-gay employee was treated more favorably regarding his discharge.  He again asserts in conclusory fashion that "while he could not remember names, there were other officers at Grady with similar attendance records who were not written up." (Dkt. 74 at 4.)  But just like with his transfer, Plaintiff offers no way for the Court (or a subsequent jury) to determine whether these unnamed officers were similar to him in any pertinent respect.  Indeed, along with failing to present any identifying information about these officers, he provides no details about how their purported absences compared with his or whether their absences were excused for some non-discriminatory reason that did not apply to him.

Having failed to identify even one comparator by name or description and having failed to provide any factual basis to establish such an individual (even if unidentified) was similarly situated, Plaintiff cannot establish a prima facie case of discrimination related to either his transfer to Grady or his discharge.  His claim fails under the *McDonnell Douglas* framework.

### 2. Plaintiff Offers No Evidence Establishing His Sexual Orientation Was a Motivating Factor for the Employment Actions or Presenting a Convincing Mosaic of Discrimination

Plaintiff next argues with short shrift that regardless of whether he can make out a prima facie case of discrimination under the *McDonnell Douglas* framework, he can still survive summary judgment under a "mixed-motive theory of Title VII discrimination." (Dkt. 65 at 12.) In support, he contends only that he "has produced evidence of discrimination under either a single-motive or mixed-motive theory." (*Id.*) It appears Plaintiff grounds his argument in his allegation that discriminatory intent was a "motivating factor" in his purported mistreatment, (*see* Dkt. 14 ¶ 58), and he throws a laundry list of facts at the wall to get something to stick,[10] (*see* Dkt. 65 at 9–11.) Relying on

---

[10] Specifically, Plaintiff points to the following evidence: Lt. Richardson testified that Plaintiff was a "good employee" and never had attendance issues while working for Lt. Richardson; Wilson's purported discriminatory remark; Wilson was not separated from Plaintiff following his initial complaints to Lt. Cherry and Sgt. Sanders; Lt. Richardson and Sgt. Sanders did not support their contention that safety or staffing needs warranted Plaintiff's temporary reassignment to the third floor; Plaintiff was never written up for attendance issues before making his complaint; Sgt. Sanders wrote Plaintiff up for taking time off that HR had approved; Lt. Cherry denied Plaintiff's request for leave in early September 2018;

some of the same evidence, he contends he "has raised abundant circumstantial evidence of discrimination." (Dkt. 65 at 8.) He argues that this circumstantial evidence is enough to present a convincing mosaic sufficient to infer that Defendants' employment decisions were motivated by discriminatory intent. (*Id.*)

The Magistrate Judge concluded none of the cited evidence was causally related to Plaintiff's transfer or discharge and so they could not be said to have motivated those actions. And that, even if they did, the Magistrate Judge concluded "they only seem to suggest a retaliatory motive rather than discrimination based upon sexual orientation." (Dkt. 67 at 53.) The Magistrate Judge also found Plaintiff failed to explain how any of the complained-of conduct was tied to his sexual orientation, "and instead simply set[] forth the list as if it were self-evidently proof of

---

Plaintiff was threatened with discipline for fraternization after making his complaint; Lt. Mayo began to monitor Plaintiff and question him about his work after Plaintiff filed the complaint; Plaintiff was denied overtime following his transfer to Grady, which other similarly situated employees received; Plaintiff was disciplined and fired for attendance and punctuality issues, while other officers with whom he worked had similar attendance records but were not written up; and Capt. Taylor's discharge recommendation was based on input from Lt. Cherry and Sgt. Lee without an independent inquiry. (*See* Dkt. 65 at 9–11.)

discrimination." (*Id.* at 55.)  The Magistrate Judge noted that, by all accounts, Plaintiff and his husband were open about their sexual orientation and there was no evidence any decisionmaker learned about his sexual orientation *because of* his complaint.  Thus, there "is no reason to think that anyone suddenly decided to change how they treated [Plaintiff] based upon previously known facts about him." (*Id.* at 58.) From all of this, the Magistrate Judge concluded Plaintiff had not offered sufficient proof that sexual orientation was a factor in his transfer or firing.  (*Id.* at 59.)

Similarly, in rejecting Plaintiff's convincing mosaic theory, the Magistrate Judge noted Plaintiff simply points "to the same evidence" that he relied on for his mixed-motive claim and "assert[s] it is sufficient . . . without additional explanation."  (Dkt. 67 at 61.)  The Magistrate Judge found that, because "Plaintiff has not presented evidence that tends to show any complained of action was motivated by his sexual orientation, as opposed to his protected activity, much less that there were any efforts to discriminate systematically against gay people," his claim fails as a matter of law.  (*Id.*)

Plaintiff objects, arguing that "certain events can evidence both [discriminatory and retaliatory] types of animus." (Dkt. 74 at 8.) He also argues that the Magistrate Judge erred in "rel[ying] upon the fact that individuals involved knew Plaintiff was gay before he complained of Wilson's statement as somehow evidencing lack of animus." (*Id.* at 9.) He specifically contends that "simply because an employer previously knew of an individual's protected trait does not mean that the individual could never be subject to discrimination." (*Id.*) And regarding his convincing mosaic theory, Plaintiff merely references the arguments he made in support of his mixed-motive theory. (Doc. 74 at 10.)

A plaintiff can succeed on a mixed-motive claim only by showing that an illegal bias "was a motivating factor for" an adverse employment action "even though other factors also motivated" the action. *See Quigg*, 814 F.3d at 1235 (citations omitted). To survive summary judgment on a mixed-motive claim, a plaintiff must offer evidence that "(1) the defendant took an adverse employment action against the plaintiff; and (2) a protected characteristic was a motivating factor for the defendant's adverse employment action." *Id.* at 1239 (citation and modifications omitted). In other words, the court must determine whether Plaintiff

27

'has presented sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that Plaintiff's sexual orientation was a motivating factor for an adverse employment decision. *Id.* (internal quotation and citation omitted).

A plaintiff can also survive summary judgment "if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (citation omitted). "Such inferences must be reasonable and not speculation," however, and "[t]he evidence presented under the convincing mosaic must be sufficient enough to overcome the lack of comparator evidence." *Geter v. Schneider Nat'l Carriers, Inc.*, 2021 WL 8200818, at *28 (N.D. Ga. Dec. 10, 2021) (internal quotation and citation omitted).

None of the evidence cited by Plaintiff demonstrates that his sexual orientation was a motivating factor in his transfer or discharge, even when viewed as a mosaic. While an adverse action could evidence both discriminatory and retaliatory intent, Plaintiff does not meaningfully grapple with the Magistrate Judge's finding that the conduct he relies on

suggests only a retaliatory—but not discriminatory—motive. Plaintiff does not even try to explain how the complained-of conduct evidences discriminatory intent, and his various attacks on Defendants' explanations for that conduct fall short of even inferring such motive. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (undercutting employer's explanation for action does not demonstrate discrimination "unless it is shown both that the reason was false and that discrimination was the real reason"). As the Magistrate Judge noted, that the pertinent decisionmakers knew Plaintiff was gay prior to his complaint—but purportedly did not mistreat him until afterward—while not dispositive alone bolsters a conclusion that the complained-of conduct speaks, if anything, to retaliation.

In short, Plaintiff fails to cite evidence sufficient for a jury to find by a preponderance of the evidence that his sexual orientation was a motivating factor in his transfer or discharge, even when viewed as a mosaic. Nor has he shown any systematic preferential treatment of non-gay employees or pretext in the various justifications Defendants offered for the complained-of conduct.

To wrap up, all of Plaintiff's discrimination claims—whether grounded in Title VII or the EPC—fail as a matter of law.

## B.    Retaliation Claims

That leaves only Plaintiff's claim for retaliation under Title VII. That statute proscribes retaliation against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceedings, or hearing under [Title VII]."  42 U.S.C. § 2000e-3(a).  A prima facie case of retaliation requires a plaintiff to show: "'(1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there is some causal relation between the two events.'"  *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001) (citation omitted).

The scope of the adverse action requirement is broader in retaliation cases than in discrimination cases.  *See Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63–64 (2006).  While "trivial harms" are not actionable, Title VII's retaliation provision prohibits any conduct that would "'dissuade[] a reasonable worker from making or supporting a charge of discrimination.'"  *Id.* at 68 (citation omitted).  At

the same time, such claims do not allow for the kind of "lessened causation test" available for discrimination claims.   *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).   Thus, a plaintiff cannot rely on a mixed-motive or motivating factor theory to prove retaliation and instead must show that the employer's "desire to retaliate was the but-for cause of the challenged employment action."   *Id.* at 352.   "At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action."   *Duncan v. Alabama*, 734 F. App'x 637, 641 (11th Cir. 2018) (citation omitted).

Like with discrimination, once a plaintiff establishes a prima facie case of retaliation, the defendant must voice a "legitimate, non-retaliatory reason for the challenged employment action."   *Pennington*, 261 F.3d at 1266.   Then, the plaintiff must prove by a preponderance of the evidence that "the reason provided by the employer is a pretext for prohibited, retaliatory conduct."   *Id.*

There is no dispute Plaintiff engaged in protected activity when he filed an internal complaint of discrimination on August 7, 2018.   In the context of his retaliation claims, Plaintiff argues he suffered adverse

action for doing this when Lt. Mayo threatened to discipline him for allegedly "fraternizing" with inmates, when someone caused Capt. Arnold to transfer him to Grady (and he was subsequently denied overtime work at the jail), and when Lt. Taylor recommended his termination. (*See* Dkt. 65 at 14–15.) The Magistrate Judge concluded that, because Plaintiff's transfer and discharge were sufficiently adverse to support a discrimination claim, those actions could also support a retaliation claim. (Dkt. 67 at 65.) The Magistrate Judge also found that Plaintiff's threatened discipline for fraternization was sufficiently adverse under the retaliation provision's lower adverse action requirement. (*Id.* at 65–67.) Accordingly, the Court limits its analysis of the parties' objections to those three actions.

## 1. A Reasonable Jury Could Find The Threatened Discipline Was Retaliatory

The Magistrate Judge found that, while Plaintiff raised a triable issue of fact about whether Lt. Mayo's threat to discipline Plaintiff was sufficiently adverse, Plaintiff could not prove causation because he failed to present evidence Lt. Mayo knew about his protected activity when she made the threat. (*Id.* at 65–70.) Plaintiff objects, arguing such evidence

exists.  (Dkt. 74 at 11–12.)  Without faulting the Magistrate Judge, the Court agrees with Plaintiff.

The Magistrate Judge correctly found the only evidence Plaintiff presented regarding Lt. Mayo's knowledge of Plaintiff's discrimination complaint was Plaintiff's own testimony that Lt. Mayo "should have been aware" of it because of her position as a lieutenant.  (Dkt. 67 at 69.)  The Magistrate Judge further concluded his speculation was not enough to raise a triable issue of fact.  (*Id.*)  The Magistrate Judge was correct— Plaintiff presented no other evidence and Plaintiff's mere speculation is not sufficient to avoid summary judgment.  (Dkts. 65 at 16; 65-2 ¶ 76.) *See also Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1054 (11th Cir. 2020) (testimony that decisionmaker *could* have had knowledge of protected activity, standing alone, is not sufficient for causation).

It was not until his objections to the R&R that Plaintiff pointed to testimony by Lt. Richardson that he believed he told Lt. Mayo about Plaintiff's complaint prior to the meeting at which Lt. Mayo threatened to discipline Plaintiff.[11]  (Dkt. 74 at 12.)  Because Plaintiff failed to cite

---

[11] While Plaintiff included Lt. Richardson's testimony in his Statement of Additional Material Facts (*see* Dkt. 65-2 ¶ 28), he did not argue to the

this evidence before the Magistrate Judge, the Court has the discretion to ignore it now.  *See Williams v. McNeil*, 557 F.3d 1287, 1292 (11th Cir.) ("[A] district court has discretion to decline to consider a party's argument when that argument was not first presented to the magistrate judge.").  But given the Eleventh Circuit's "strong preference for deciding cases on the merits," *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1332 (11th Cir. 2014)—and because Defendants do not take issue in their response with Plaintiff's untimely assertion—the Court considers it and concludes a reasonable jury could find Lt. Mayo knew about Plaintiff's protected activity.

Lt. Richardson wrote a report shortly after his investigation noting that, after first learning of Plaintiff's complaint, he "immediately informed the other Lieutenants on the shift of his statements." (Dkt. 57-1, Ex. 9.)  When asked which lieutenants were on this shift, Lt. Richardson testified that he believed "it was Lieutenant Cherry, Lieutenant Mayo, must have been Lieutenant Chichinsky." (Dkt. 57 at 49:20–50:2.)  That is, he thought he told them all.  Lt. Richardson's

---

Magistrate Judge that this testimony demonstrated Lt. Mayo's knowledge.

testimony provides evidence Lt. Mayo knew about Plaintiff's protected activity when she decided to discipline him for fraternization—a question of fact that should be presented to the jury.

Defendants argue that regardless of whether Lt. Mayo had knowledge of Plaintiff's discrimination complaint, his claim still fails because the threatened discipline was not an adverse action and because there is no evidence Defendants' justifications were pretextual. (Dkt. 75 at 9–10.) Specifically, they contend: (1) the mere threat of discipline— without any follow-up—is not sufficient to constitute an adverse action; and (2) there is no evidence Lt. Mayo knew that giving deputy trays to orderlies was a common practice, thus Defendants' justification that Lt. Mayo was merely enforcing Sheriff's Office policy establishes her reasoning was not pretextual. (*Id.*) Defendants are wrong on both fronts.

Whether an employment action is sufficiently adverse to support a claim of retaliation depends on whether such action would have "'dissuade[d] a reasonable worker from making or supporting a charge of discrimination.'" *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 857 (11th Cir. 2020) (citation omitted). And the Eleventh Circuit has recognized that "adverse actions which fall short of ultimate employment

decisions" are still actionable under Title VII because such actions "could stifle employees' willingness to file charges of discrimination." *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998).

Here, just a little over a month after filing his discrimination complaint, Plaintiff was called into a meeting with three of his commanding officers, informed he would receive a written warning for what he contends was a common practice at the jail, and threatened with being fired. Capt. Arnold only relented and withdrew the warning after Plaintiff complained he was being singled out for unfair treatment. A reasonable jury could find threatened termination at the hands of three supervisors—based on something the employee should not have expected to even be disciplined for and so soon after filing a complaint of discrimination—could chill that employee from engaging in protected activity. *See Monaghan*, 955 F.3d at 863 (supervisor's statements threatening "both termination and possible physical harm" were sufficiently adverse to support retaliation claim); *see also Guajacq v. EDF, Inc.*, 601 F.3d 565, 578 (D.C. Cir. 2010) ("A threatening . . . statement, standing alone, might well constitute a materially adverse action."); *Hawthorne v. City of Prattville*, 2020 WL 5880135, at *19 (M.D.

Ala. Oct. 2, 2020) (suggesting that "statements from a supervisor which threatened termination" would be sufficiently adverse to support retaliation claim).

Finally, while it is a close call, there is enough evidence in the record for a reasonable jury to conclude it was acceptable for officers to give orderlies deputy trays and, therefore, that Defendants' proffered justification for threatening Plaintiff was pretextual. For one, Plaintiff and others—including Sgt. Sanders—testified that, although it was against Sheriff's Office policy, other officers would give deputy trays to orderlies and were not disciplined. (*See* Dkts. 58 at 60:20–61:7; 59 at 64:1–7; 60 at 15–18.) And after Plaintiff complained about being singled out for doing so, Capt. Arnold not only withdraw the warning, he also put out a directive to clarify the policy. (Dkt. 60 at 162:6–13.) While there is no direct evidence Lt. Mayo knew about the purportedly common practice, there is evidence that other participants in the meeting—including Sgt. Sanders and Lt. Cherry—did. (Dkts. 58 at 60:20–61:7; 60 at 160:14–162:18.) But they said nothing to educate Lt. Mayo. This evidence could lead a reasonable jury to determine Defendants' justification was pretextual. *See Taylor v. Cardiovascular Specialists,*

37

*P.C.*, 2013 WL 12310269, at *28 (N.D. Ga. Dec. 11, 2013) (holding that disciplining employee for common practice for which others were not disciplined, even if against company policy, raised question of fact over pretext).

The Court does not suggest mere threats of discipline will always (or ever) be enough.  But, in this case, the threat was termination of employment, it was made before several supervisors, it was made just weeks after the protected activity, and it was made in response to conduct that some evidence suggests was commonplace and permissible at the time.  In this situation, the Court finds Plaintiff has presented a question of material fact regarding whether he was threatened with adverse action in retaliation for his protected activity and whether the proffered explanation was pretextual.  In other words, Plaintiff has carried his burden of presenting the necessary prime facie case and of showing Defendant's non-retaliatory reason may have been a pretext for prohibited, retaliatory conduct.  Plaintiff's objection to the R&R on this claim is sustained.

### 2.   No Reasonable Jury Could Conclude Plaintiff's Discharge Was Retaliatory

Capt. Taylor recommended Plaintiff's discharge.  No evidence suggests she was aware of Plaintiff's protected activity at the time.  The Magistrate Judge concluded that—contrary to Plaintiff's theory—Lt. Cherry's and Sgt. Lee's knowledge of his protected activity could not be imputed to Capt. Taylor through a "cat's paw" theory of liability.  (Dkt. 67 at 71–73.)  Specifically, the Magistrate Judge credited Capt. Taylor's undisputed testimony that her decision to recommend Plaintiff's firing was based on her independent review of Plaintiff's attendance records and found there was no evidence Lt. Cherry or Sgt. Lee harbored retaliatory animus.  (*Id.* at 72–73.)  Plaintiff objects, arguing that Capt. Taylor relied on biased information from Lt. Cherry and Sgt. Lee.  (*Id.* at 12–13.)  Plaintiff's objection is meritless.

Plaintiff specifically argues he can prove Capt. Taylor recommended his firing based on input from Lt. Cherry and Sgt. Lee, who had a retaliatory bias against him.  (Dkt. 65 at 16.)  He points to the following evidence:

- Capt. Taylor often spoke with other lieutenants about employees under her supervision;

- After Capt. Taylor saw the number of absences Plaintiff accrued, she believed she "probably" asked Lt. Cherry or Sgt. Lee whether they "were excused," but discovered that over ten were not;

- Lt. Cherry and Sgt. Lee did not go into "any sort of detail" about the absences and tardies, but simply confirmed that between 10 and 20 of the incidents were unexcused;

- Capt. Taylor likely also spoke with Capt. Arnold about Plaintiff, but could not recall.

(*See* Dkt. 65 at 17.)  The Court agrees with the Magistrate Judge that this evidence is not sufficient to establish cat's paw liability for Plaintiff's discharge.

Under a cat's paw theory, if a decisionmaker followed an improperly biased (*i.e.*, retaliatory) recommendation from another person without independently investigating—such that the decisionmaker acted "as a mere conduit, or 'cat's paw' to give effect to" the other person's retaliatory animus—that animus may be imputed to the decisionmaker.  *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999) (citation omitted).  For cat's paw liability to apply, there must be a causal connection between the retaliatory animus and the ultimate decision. *See Crawford v. Carroll*, 529 F.3d 961, 979 n.21 (11th Cir. 2008); *Pennington*, 261 F.3d at 1270 n.5.  Plaintiff must, therefore, prove Lt. Cherry's and/or Sgt. Lee's purported animus was a "'but-for' cause of, or

40

a determinative influence on,'" Capt. Taylor's decision to recommend termination. *See Moore v. Delta Airlines, Inc.*, 2020 WL 230978, at *19 (N.D. Ala. Jan. 15, 2020) (quoting *Sims v. MVM, Inc.*, 704 F.3d 1327, 1337 (11th Cir. 2013)).  He has not put forth evidence from which a jury could reach this conclusion.

Capt. Taylor testified she made an independent decision to review her new employees' attendance records.  (Dkt. 61 at 27:5–28:9.)  No evidence suggests Lt. Cherry and Sgt. Lee caused Capt. Taylor to undertake that review.  In doing so, Capt. Taylor had no knowledge of Plaintiff's discrimination complaint, nor did she review any specific documentation about Plaintiff's absences.  So no evidence suggests the review was done for any improper purpose or because of any improper influence.  While conducting the review, she noticed Plaintiff had been late an excessive amount and had (she believed) at least ten unexcused absences.  And the evidence Plaintiff relies on does not change the calculus.

For one thing, Plaintiff argues only by conclusory assertion that Capt. Taylor's recommendation was based on information she reviewed from Lt. Cherry and Sgt. Lee.  (Dkt. 65 at 17.)  But he fails to explain *how*

Capt. Taylor's testimony establishes this fact.  Capt. Taylor testified that she spoke to "whoever had [Plaintiff's] file" about which of his absences and tardies were excused.  (Dkt. 61 at 62:2-63:18.)  While Capt. Taylor speculated that individual "probably" would have been Lt. Cherry or Sgt. Lee, she did not solicit any opinion over whether Plaintiff should be discharged or even whether his absences were grounds for termination. (*Id.*)   Indeed, she testified that when making a recommendation regarding an employee's continued employment, she "give[s] it based on not what the sergeant did or did not do" but "based on the employee's actions," and that she has never recommended that a probationary employee with excessive absences stay on.  (*Id.* at 74:6-75:11.)   In Plaintiff's case, Capt. Taylor decided on her own accord to investigate the attendance records of the officers on her new shift, and because Plaintiff was a probationary employee, she was required to make a recommendation about his employment.  There is no evidence that Lt. Cherry or Sgt. Lee influenced her decision to recommend Plaintiff's firing.

And regardless of whether Capt. Taylor spoke with Lt. Cherry and Sgt. Lee about Plaintiff's absences, there is no evidence the information

they might have provided Capt. Taylor—*i.e.*, that Plaintiff had at least 10 unexcused absences or tardies—was inaccurate.[12]   In fact, Plaintiff admits he was absent 12 times between January and March 2019, and he fails to provide any evidence that those absences were excused.  (Dkt. 65-1 ¶ 71.)  Capt. Taylor testified about her conclusion.  She also testified that if an employee had provided a doctor's note—or got approval for a significant number of sick days—that excuse would be added to the employee's file.  (Dkt. 61 at 37:2–40:25.)  And Plaintiff testified that if he "had a doctor's appointment, [he] brought in a doctor's excuse."  (Dkt. 59 at 100:6–101:4.)  Yet he points to no documented excuses showing that Capt. Taylor's belief was wrong.  Because the information purportedly

---

[12] In arguing that his attendance record does not actually matter, Plaintiff asserts that other employees with similar attendance records were not disciplined.  (Dkt. 74 at 14.)  But like with his discrimination claim, this argument fails because he has offered only speculative testimony without actually identifying a single comparable individual.  And, as explained above, the information allegedly provided about his absences was undisputedly true and cannot serve as the basis for cat's paw liability.  *See Kramer v. Logan Cty. Sch. Dist. No. R-1*, 157 F.3d 620, 624 (8th Cir. 1998) (pertinent question for cat's paw liability is "whether [the decisionmaker] accurately a[ss]essed [the plaintiff's] situation"); *Dickinson v. Edward D. Jones & Co., L.P.*, 2016 WL 4500777, at *3 (D. Idaho Aug. 26, 2016) (no cat's paw liability where account given to decisionmaker "was accurate and was expressly confirmed").

43

given to Capt. Taylor was true, the cat's paw theory cannot apply. *Compare Lindsey v. Walgreen Co.*, 615 F.3d 873, 876 (7th Cir. 2010) (affirming summary judgment where cat's paw manipulator did not conceal evidence from or present falsehoods to decisionmaker) *with Williams v. Ala. Dep't of Transp.*, 509 F. Supp. 2d 1046, 1060 (M.D. Ala. 2007) (holding cat's paw theory applied because decisionmaker admitted that he merely took the word of manipulators and had "full confidence in their ability to make this type of judgment").

Finally, no direct or circumstantial evidence suggests Lt. Cherry or Sgt. Lee bore retaliatory animus to Plaintiff.  On this issue, Plaintiff points only to their awareness of his protected activity but provides no reason for the Court (or a subsequent jury) to think Lt. Cherry or Sgt. Lee acted in a retaliatory manner.  He admits he and Sgt. Lee had a "good relationship" and offers no other evidence of bad motive on her part. (Dkt. 59 at 70:6–12.)[13]  He does not even argue that she had such motive.

---

[13] The undisputed evidence also demonstrates Lt. Cherry and Sgt. Lee had valid reasons for the limited actions they actually took against him. Specifically, Lt. Cherry denied Plaintiff's request for leave because he had insufficient vacation days remaining. (Dkts. 60 at 176:6–180:22; 66-1 ¶¶ 59–62.)  Plaintiff admits as much.  (Dkt. 59 at 43:2–12.)  And regarding his tardies, Sgt. Lee followed Sheriff's Office policy in twice disciplining Plaintiff for having more than three tardies in a 90-day

In arguing that Lt. Cherry had animus against him, Plaintiff points to the fact that she kept him on "stand by" for overtime and was "part of the group that discussed Plaintiff's transfer to Grady." (*Id.*)  But Lt. Cherry testified she had nothing to do with Plaintiff's transfer and no evidence disputes that assertion.  (Dkt. 60 at 194:23–24.)  As already explained, no evidence suggests she prevented Plaintiff from working overtime in preference to anyone else.  So, these actions could not suggest any improper animus.  All of this is to say, Plaintiff has presented no direct evidence either employee had any retaliatory animus towards him.

Circumstantially, Lt. Cherry knew about Plaintiff's discrimination complaint.  But, Capt. Taylor's review of Plaintiff's attendance records (and Lt. Cherry's potential involvement) occurred at least 6 or 7 months later.  (*See* Dkts. 65-1 ¶ 7; 66-1 ¶ 54.)  This is too much time to suggest any causal connection (even if one were to assume Lt. Cherry provided information to Capt. Taylor about Plaintiff's attendance).  So, even if these two individuals provided information to Capt. Taylor, there is no

---

period.  (*See* Dkts. 65-1 ¶¶ 14, 17.)   Plaintiff does not even argue Sgt. Lee's write-ups demonstrated animus.

evidence from which a jury could conclude they did so because of some retaliatory animus—a necessary element of a cat's paw theory.

To go even further, assuming Plaintiff could show from this circumstantial evidence that Lt. Cherry had some improper animus towards Plaintiff, Plaintiff has presented no evidence that she (as opposed to Sgt. Lee) talked with Capt. Taylor about Plaintiff's attendance.[14] Plaintiff has presented no evidence from which a jury could conclude Lt. Cherry improperly influenced Capt. Taylor. *See D'Andrea v. Paragon Sys., Inc.*, 2021 WL 4476662, at *4 (D.D.C. Sept. 30, 2021) (granting summary judgment on cat's paw theory where plaintiff claimed three individuals tainted decisionmaker but argued only one had treated her poorly).

For all of these reasons, the Court concludes Plaintiff's cat's paw theory fails. *See Polion v. City of Greensboro*, 614 F. App'x 396, 399 (11th Cir. 2015) (holding plaintiff must show that a "biased recommendation" was followed and finding summary judgment appropriate where plaintiff

---

[14] Capt. Taylor said she "probably" spoke with *either* Lt. Cherry *or* Sgt. Lee but could not recall with certainty. (*Id.* at 62:16–18.) She never said she might have spoken with both.

failed to "present evidence that [the subordinate]'s recommendation was biased"). The Court adopts the Magistrate Judge's recommendation that summary judgment be granted on this claim.

### 3. A Reasonable Jury Could Conclude The Transfer Was Retaliatory

Regarding Plaintiff's transfer to Grady, the Magistrate Judge found that, while not conclusive, "a reasonable factfinder could conclude that Capt. Arnold—who solicited the names in the first place—was the final decisionmaker," and it was undisputed that Capt. Arnold knew about Plaintiff's discrimination complaint. (Dkt. 67 at 70–71.) Because Plaintiff's transfer came "closely on the heels of his EEOC charge of discrimination," a jury could find the requisite causal connection. (*Id.* at 71.) Defendants object, claiming the Magistrate Judge erred when he (1) determined the transfer to Grady was an adverse action and accepted Plaintiff's allegations about the denial of overtime; (2) concluded there was sufficient evidence of causation based on the timing between Plaintiff's EEOC charge and his transfer; and (3) decided Defendants failed to offer a non-retaliatory reason for the transfer and that there was sufficient evidence of pretext. (Dkt. 73 at 4.)

As the Magistrate Judge explained, Lt. Cherry testified that only someone higher up in the Sheriff's Office could effectuate a transfer between facilities. (Dkt. 60 at 195:2–10.) And according to Lt. Richardson, Plaintiff's transfer occurred after Capt. Arnold asked his lieutenants to suggest the names of officers who could be moved. (Dkt. 57 at 129–32.) Thus, a reasonable jury could find that Capt. Arnold—who solicited the names in the first place—was the final decisionmaker. Capt. Arnold's knowledge of Plaintiff's complaint is undisputed, and the fact the transfer occurred shortly after Plaintiff filed his EEOC charge—a little over a month—could lead a reasonable jury to find Plaintiff's protected activity was a but-for cause of the transfer. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) ("The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action."). Defendants also concede—as they must—that the denial of an opportunity to work overtime is sufficiently support a retaliation claim. (Dkt. 73 at 7); *see Shannon v. Bellsouth Telecomms, Inc.*, 292 F.3d 712, 716 (11th Cir. 2002).

Defendants argue for the first time that these facts do not matter because Plaintiff's transfer and subsequent loss of overtime are two separate events that involve separate decisionmakers. They cite no evidence to substantiate this fact. (*Id.*) Plaintiff alleged he suffered adverse action when he was transferred to a location at which his opportunity for overtime diminished. Defendants could have tried to present evidence before the Magistrate Judge that the former did not cause the latter. Instead, they engaged Plaintiff's allegation by pointing out that he was permitted to work some overtime while at the hospital. (Dkt. 66 at 4.) As a result, Plaintiff was denied the opportunity to engage on the factual issue Defendants now raise, and that is not fair. Defendants cannot present that issue now, particularly without any citation to the record. Perhaps they can do so at trial and the Court could consider such evidence at the close of the case.[15]

---

[15] Defendants also argue that Plaintiff's transfer was not adverse because "there was ample overtime to be worked at Grady," and Plaintiff did work some overtime there. (Dkt. 73 at 8 n.3.) In support, they cite payroll records showing that Plaintiff worked overtime during six shifts at Grady. (*Id.* at 9.) But again, regardless of the amount of overtime that Plaintiff worked at Grady, there is still record evidence that Plaintiff was barred from working certain other overtime hours. That alone is sufficient. *See Shannon*, 292 F.3d at 716. Defendants' reliance on cases that required the plaintiff to show that comparators worked more

Defendants also say Plaintiff cannot prove causation because there is no evidence the decisionmaker who transferred him knew about his protected activity. (Dkt. 73 at 11–12.) Specifically, they contend that, because there is no conclusive evidence that Capt. Arnold was the one who decided to transfer Plaintiff, no reasonable jury could find that the decisionmaker had knowledge of Plaintiff's complaint. (*Id.*) In essence, Defendants argue a jury could not conclude Capt. Arnold was the ultimate decisionmaker. The Court disagrees. That Capt. Arnold directly solicited input from his lieutenants about who to transfer to Grady is enough to create an inference—the truth of which will ultimately be resolved by the jury—that he was the one who decided to transfer Plaintiff. *See Ruiz de Molina*, 207 F.3d at 1356 (11th Cir. 2000) (noting at summary judgment stage, "all reasonable inferences must be drawn in [the non-movant's] favor").

Defendants also argue there was no evidence Capt. Arnold had retaliatory animus given Plaintiff's admission that Capt. Arnold made several decisions that positively impacted him. (Dkt. 73 at 13.) But the

---

overtime is unavailing because those cases dealt with the more stringent discrimination-based adverse action requirement. (*See* Dkt. 73 at 10.)

fact Capt. Arnold made other decisions helpful to Plaintiff *before* he filed his EEOC charge has no bearing on whether the actions he took post-filing were retaliatory.  Whether Capt. Arnold's prior behavior speaks to any retaliatory animus he may have later developed is an issue for the jury.

Defendants then contend that the time between Plaintiff's filing his EEOC charge and his starting work at Grady—nearly four months—is too attenuated to suggest a causal connection.[16]  (Dkt. 73 at 14.)  But Defendants fail to acknowledge that Plaintiff was transferred to Grady at least as early as mid-October 2018 and then was out of work for two months between October and December.  When Plaintiff returned to work, his transfer to Grady was already in place.  So while it is true that Plaintiff did not *start* working at Grady until about four months after his complaint, the evidence shows that Plaintiff was transferred at least as early as October 17—a little over a month after filing his EEOC charge.

---

[16] Defendants also argue that there is no evidence Capt. Arnold knew about Plaintiff's EEOC charge, but only his internal complaint.  (Dkt. 73 at 14 n.5.)  Regardless, Plaintiff's internal complaint was filed about three weeks before his EEOC charge, and the Court concludes that those additional few weeks are not enough to strip the question of causation from the jury.

(*See* Dkt. 56-4 ¶ 3.)  The suspicious nature of this timing (in the light of the other evidence) is enough to put the issue to the jury.

Finally, Defendants argue that because it is undisputed there was a need for detention officers at Grady—and that the Sheriff's Office also transferred two detention officers along with Lt. Cherry and Capt. Taylor without explanation—they have established their reason for transferring Plaintiff is non-pretextual.  (Dkt. 73 at 15.)  Defendants miss the point. Regardless of whether there was a need for detention officers at Grady— and regardless of whether the Sheriff's Office also moved other individuals to Grady—Defendants did not sufficiently explain why *Plaintiff's* transfer was justified.  Defendants do not even attempt to identify the lieutenant (or lieutenants) who offered up Plaintiff's name for transfer nor do they point to any objective criteria for selecting officers for transfer.  This failure by Defendants—along with the suspicious timing of the transfer—is enough to raise a question of fact on this issue. A reasonable jury could conclude Plaintiff's transfer to Grady—and his subsequent reduction in overtime—was retaliation for his protected activity.  Accordingly, summary judgment on this issue is not warranted.

Plaintiff's retaliation claims based on his threatened discipline for fraternization and his transfer to Grady survive summary judgment. His retaliation claim based on his discharge fails as a matter of law.

## IV.  Conclusion

The Court **OVERRULES** in part and **SUSTAINS** in part Plaintiff's Objections (Dkt. 74), **OVERRULES** Defendants' Objections (Dkt. 73), **ADOPTS** the Magistrate Judge's Final Report and Recommendation (Dkt. 67) **AS MODIFIED** in this Order, and **GRANTS** in part and **DENIES** in part Defendants' Motion for Summary Judgment (Dkt. 56).

The Court **ORDERS** this case to mediation. The parties may retain a private mediator at their own expense. Or they may ask the Court to appoint a magistrate judge to conduct the mediation. The parties are not required to pay for mediation by a magistrate judge.

The parties shall advise the Court of their mediation preference no later than 30 days after the date of this Order. If the parties elect to retain their own mediator, they shall identify the mediator no later than 45 days after the date of this Order. Mediation must occur within 90 days after the date of this Order. The parties must have present at the

mediation a person with authority to settle this litigation. The parties shall file a report on the outcome of their mediation no later than 7 days after the mediation concludes.

The Court **STAYS** this case pending mediation. The Court **DIRECTS** the Clerk to **ADMINISTRATIVELY CLOSE** this case during the period of the stay.

**SO ORDERED** this 30th day of September, 2022.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE